MARK SCHERZER, ESQ. (MS-2622)
Attorney for Plaintiff
29 John Street, Suite 1103
New York, New York 10038
Tel: (212) 406-9606

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
SUSAN ZURNDORFER,                                 :

              Plaintiff,                :          04 CIV 3497 (RCC)
                                                                           ECF CASE

   -against-                                    :

UNUM LIFE INSURANCE COMPANY        :
OF AMERICA, d/b/a UNUMPROVIDENT,                 **COMPLAINT**
                                                 :
              Defendant.
-----------------------------------------------------X

      Plaintiff Susan Zurndorfer, by her attorney, Mark Scherzer, Esq., for her Complaint, respectfully alleges:

### FIRST CAUSE OF ACTION:
### IMPROPER DENIAL OF DISABILITY BENEFITS

      1.      This action seeks benefits to which Ms. Zurndorfer is entitled as a consequence of illness and symptoms associated with her multiple sclerosis ("MS") under a long term disability plan (the "Plan") maintained by her employer, CSC The United States Corporation Company ("CSC"), and administered by defendant Unum Life Insurance Company of America ("Unum").

      2.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, and pursuant to §§ 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), (e)(1), and (g).

      3.      Venue is appropriate in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2), because, *inter alia*, Unum's breach took place here.

4. At all times relevant to this Complaint, Ms. Zurndorfer has been a citizen of the State of New York, residing in the city of New York.

5. Upon information and belief, defendant Unum is a corporation that is authorized to conduct and is engaged in the conduct of the business of insurance in the State of New York, with a principal place of business located at 2211 Congress Street, Portland, Maine.

6. Ms. Zurndorfer at all relevant times was insured under the Plan. Coverage was provided to her as an employee of CSC, which, upon information and belief, maintains its principal place of business at 1133 Avenue of the Americas, New York, New York. The Plan has a Plan No. 503347-014.

7. The Plan is an "employee welfare benefit plan" or a "welfare plan" covered by ERISA, including its civil enforcement provisions. ERISA §§ 3(1), 3(3), 4(a), 502(a)(1)(B), and (a)(3), 29 U.S.C. §§ 1002(1), (3), 1003(a), 1132(a)(1)(B), and (a)(3).

8. Upon information and belief, Unum is the insurer and acts as the claim administrator for the Plan.

9. With regard to Ms. Zurndorfer, the Plan provides a benefit, which is payable through age sixty-five (65), commencing after a 90-day elimination period, so long as she is "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury," suffers "a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury," and "during the elimination period, [she] is unable to perform any of the material and substantial duties of [her] regular occupation." "Regular Occupation" is defined by the Plan as "the occupation you are routinely performing when your disability begins." The Plan defines "material and substantial duties" as those that "are normally required

for the performance of your regular occupation," and which "cannot be reasonably omitted or modified." The basic monthly Plan benefit is 50% of the plan participant's "Monthly Earnings," defined as including "total income before taxes" and "income actually received from commissions," but cannot exceed a monthly maximum benefit of $7,000.00. Upon information and belief, Ms. Zurndorfer's pre-disability monthly "Insurance Earnings" were $8,135.87, which qualifies her for a monthly benefit of $4,067.94.

10. Since on or about March 9, 1998, Ms. Zurndorfer was employed full time by CSC as a sales account manager. Upon information and belief, CSC assists its customers in forming their business entities and complying with legal requirements for maintaining those entities, including addition of intellectual property assets  receipt of service of process and litigation management  UCC filings and UCC portfolio lifecycle management. Ms. Zurndorfer's territory covered mid and lower Manhattan, both east and west sides, and her customers were approximately 45 major corporate law firms.

11. A substantial component of Ms. Zurndorfer's job was traveling around New York City to visit her CSC customer accounts at their places of business.

12. In or about November, 2000, after Ms. Zurndorfer complained to her physician of increased left leg sluggishness and weakness and the physician performed tests, including MRIs of the brain and cervical spine, Ms. Zurndorfer was diagnosed as suffering from MS.

13. According to the observation of her neurologist at a dedicated multiple sclerosis treatment center, Ms. Zurndorfer's symptoms of gait disorder and fatigue progressed from the time of diagnosis through 2002, when Ms. Zurndorfer required arthroscopic shoulder surgery to correct a condition which the physician believed had been caused by her abnormal gait and inability to maintain appropriate balance while carrying the tools of her trade.

14. On or about August 15, 2002, because of progressive symptoms arising out of her MS, including, *inter alia*, severe fatigue, weakness, inability to ambulate or negotiate stairs in a timely and safe manner, gait disturbance, and falling, Ms. Zurndorfer stopped working and was disabled within the terms of the Plan.

15. Upon information and belief, CSC also maintains a short term disability plan which is insured and administered by Unum.

16. Unum approved Ms. Zurndorfer for benefits under the short term disability plan for the period from August 15, 2002, through November 13, 2002.

17. Ms. Zurndorfer timely filed a claim for long term disability benefits, which based on her date of disability and the Plan's 90 day elimination period, she became eligible for effective November 13, 2002.

18. Upon information and belief, on or about October 18, 2002, Ms. Zurndorfer's claim was reviewed by a Unum nurse, who opined that clinical exam findings of "limited walking, standing, sustained activities related to fatigue, gait disturbance, drop foot, and continued treatment/PT [physical therapy]" supported disability at that time.

19. Upon information and belief, on or about October 29, 2002, Ms. Zurndorfer's claim was reviewed by a Unum vocational consultant who classified her occupation as that of a "Sales Representative," and concluded that this would require, *inter alia*, "frequent reaching, handling and near acuity, as well as constant talking and hearing," and that "it is reasonable to expect that this occupation would also require frequent travel."

20. Upon information and belief, Unum convened a "roundtable" on October 29, 2002, at which Ms. Zurndorfer's claim was discussed and it was determined "reasonable to support disability."

21. Unum, by letter dated November 11, 2002, approved benefits under the Plan through December 13, 2002, subject only to its investigation and determination whether, for purposes of a benefit increase option which Ms. Zurndorfer elected on January 1, 2002 (increasing her benefit from 50% to 66-⅔%), Ms. Zurndorfer's MS was a "pre-existing condition" for which coverage would be excluded by the terms of the Plan.

22. On January 28, 2003, Unum denied coverage only for the amount of the increased benefit, based on its determination that Ms. Zurndorfer's illness constituted a "pre-existing condition" with regard to that increase.

23. The Plan contains a provision providing that Social Security disability benefits are deductible from benefits payable under the Plan. Upon information and belief, Unum provided assistance to Ms. Zurndorfer, free of charge, to aid her in submitting and obtaining Social Security disability benefits. Upon information and belief, Ms. Zurndorfer was approved for Social Security disability benefits effective February, 2003, in the amount of $1,755.00, which is deductible from Plan benefits to which she is entitled on or after that date.

24. Upon information and belief, on or about April 29, 2003, a Unum claim examiner initiated a medical review of Ms. Zurndorfer's claim.

25. Upon information and belief, a "roundtable" was convened by Unum on April 30, 2003, to discuss the further handling of Ms. Zurndorfer's claim; however, the administrative record does not provide any details about the participants in that roundtable nor the substance of their discussion.

26. Upon information and belief, a Unum nurse, Janice M. Albert, R.N., reviewed Ms. Zurndorfer's claim on May 14, 2003, and concluded that disability was not supported because "it is unclear what had changed at the DOD [date of disability] in respect to her

complaints related to her MS diagnosis." According to Nurse Albert, there was no basis for disability past a "reasonable recovery time for her [shoulder] surgery," which Nurse Albert identified as "4 – 6 weeks."

27.     Upon information and belief, a Unum physician with no expertise in neurology, Daniel Krell, M.D., affirmed Nurse Albert's determination, concluding that "there is no documentation of a worsening of the claimant's MS at the time of the DOD" and that "there is no documentation of a condition that would preclude RTW [return to work], in the claimant's usual occupation, after recovery from her shoulder surgery."

28.     Upon information and belief, a vocational review was conducted by a Unum consultant, Kenneth Martin, on May 19, 2003, which noted that Ms. Zurndorfer had "worked as a sales representative for a legal publishing company for 12 years" prior to her 4 years of work with CSC, and reaffirmed that her occupation entailed "travel to meet with both existing and potential customers." Based largely on Dr. Krell's conclusions, Mr. Martin observed "it does appear that the claimant is not precluded from returning to work in her own occupation."

29.     Upon information and belief, a further "roundtable" was conducted on May 21, 2003, although the participants are not disclosed by the administrative record. The summary description of the discussion conducted at that roundtable was: "claimant is not precluded from working in own occ. [occupation], and no bens [benefits] are payable."

30.     Upon information and belief, Unum contacted Cathy Crowley, CSC's Human Resources Administrator, by telephone on May 22, 2003, to provide advance notice of its intention to terminate Ms. Zurndorfer's disability benefits. Upon information and belief, Ms. Crowley expressed 'extreme surprise' about Unum's decision and stated that "when she was working for them she had a difficult time walking and they could tell her condition was

deteriorated." Ms. Crowley also pointed out that Unum had itself helped Ms. Zurndorfer secure Social Security disability benefits, which "as we know, it is difficult to get approval from soc. sec."

31. Upon information and belief, Unum telephoned Ms. Zurndorfer to orally notify her of its decision to terminate benefits. When Ms. Zurndorfer asked why Unum was terminating benefits in May, 2003, even though its reasoning – that her disability could be justified only as long as the anticipated 4 to 6-week recovery from her shoulder surgery – should have resulted in a denial of disability status subsequent to September, 2002, Unum's claim examiner recorded that she had explained to Ms. Zurndorfer: "I confirmed we had this information at onset but it was not properly reviewed."

32. By letter, dated May 23, 2003, Unum informed Ms. Zurndorfer that it was terminating her Plan benefits because "clinically you are stable and doing well" and "there has been no progression of your multiple sclerosis."

33. Upon information and belief, Unum made no effort to investigate Ms. Crowley's assertion that Ms. Zurndorfer's co-workers had directly observed the deterioration in her physical ability to perform her occupational duties before issuing its decision to terminate benefits.

34. By letter, dated July 14, 2003, Ms. Zurndorfer timely appealed the denial, provided additional medical documentation, and submitted a letter from her attorney, which argued (i) Unum failed to document any improvement in Ms. Zurndorfer's medical condition which would justify its determination that she was no longer disabled; (ii) Ms. Zurndorfer's occupational duties required "heavy travel throughout Manhattan," including "fifteen (15) field appointments per week," and "frequently required [that she] carry a laptop and heavy materials";

(iii) that her MS had deteriorated both prior to, and after, August, 2002; (iv) Unum selectively quoted from the status reports of Dr. Mark Pascal, an oncologist who administered a course of medication to Ms. Zurndorfer, but who is "not a Neurologist" and his treatment was principally focused on "Ms Zurndorfer's blood work and the effects of the Mitoxantrone on her overall hematological status"; and (v) Unum relied on staff medical consultants who lacked appropriate expertise rather than obtain the opinion of an appropriately qualified medical expert or independent medical examination, to which Ms. Zurndorfer voluntarily agreed to submit.

35. On or about August 7, 2003, Unum conducted a further medical review by referring Ms. Zurndorfer's claim to another staff nurse, Susan Grover, RN, and staff physician Alan Neuren, M.D., a neurologist. Ms. Grover concluded, and Dr. Neuren concurred, that, upon their review, MRI studies "actually fail to demonstrate findings of a progressive nature," "there appear to be significant discrepancies between the progress notes of Drs. Picone [Ms. Zurndorfer's treating neurologist, affiliated with the Bernard W. Gimbel Multiple Sclerosis Comprehensive Care Center] and Pascal [the oncologist who administered Ms. Zurndorfer's Mitoxantrone treatment]," and, ultimately, "there is nothing in the record to suggest the insured's condition had worsened at the time of the shoulder surgery".

36. Adopting the conclusions of Nurse Grover and Dr. Neuren, Unum upheld its termination of benefits in a letter, dated August 11, 2003.

37. Upon information and belief, in reconsidering Ms. Zurndorfer's claim, Unum did not obtain the opinion of an independent medical expert, did not seek to examine Ms. Zurndorfer personally, and failed to investigate Ms. Crowley's statement that Ms. Zurndorfer's deteriorating ability to perform her occupational duties had been directly observed by her co-workers at CSC.

38. To address the new rationales articulated by Unum in upholding its decision, Ms.

Zurndorfer submitted additional information for internal administrative review in an effort to resolve her claim without recourse to litigation.  By letter from her attorney, dated October 1, 2003, Ms. Zurndorfer urged Unum to reconsider its prior determination because, *inter alia,* (i) it had failed to demonstrate an improvement in her condition justifying a termination of benefits after they had been approved; (ii) it had improperly imposed a non-Plan requirement that she demonstrate a "sudden deterioration" in her condition, even though her illness was gradual and progressive in nature; (iii) it had retroactively characterized its initial approval of disability benefits as based solely on Ms. Zurndorfer's shoulder surgery even though that decision was, in fact, specifically based on her progressive MS symptoms; (iv) it had selectively ignored multiple notations in Ms. Zurndorfer's medical chart which indicated the progressive nature of her symptoms; (v) it had improperly interpreted Ms. Zurndorfer's efforts to continue working – despite increasing symptoms noted by her and observed by others – as indicating a fully intact ability to perform the substantial and material duties of her occupation; (vi) it had incorrectly interpreted Dr. Pascal's medical rating of "ambulatory" under the Eastern Cooperative Oncology Group ("ECOG"), as indicating an unimpaired ability to walk and negotiate stairs, when that rating merely meant that Ms. Zurndorfer was not "confined to bed or chair more than 50% of waking hours"; and (vii) it had provided nothing but one-sentence summary notations of the discussions conducted at the April 30th and May 21st roundtables, suggesting an effort to withhold or conceal the participants in and the substance of those meetings.

39.     Upon information and belief, Unum conducted no further medical review as a result of the October 1st letter, nor did it investigate the effect of Ms. Zurndorfer's symptoms as observed by her CSC co-workers.

40.     Unum reaffirmed its determination by letter, dated November 7, 2003, again

relying on its assessment that "[brain] MRI results argue against progressive disease" and that Ms. Zurndorfer was able to work prior to August 16, 2002, despite the presence of MS symptoms at that time.

41. To address the new medical argument made by Dr. Neuren, Ms. Zurndorfer on or about November 18, 2003, sent a letter from her treating Neurologist, Dr. Picone, contradicting the principal reasoning relied upon by Unum: (i) Unum "appears to have overlooked that Ms. Zurndorfer's diagnosis was not made based on … [a brain] MRI alone,]" but was made "after an MRI of the cervical spine" and "a subsequent repeat scan" – all of which were in Unum's possession; (ii) cervical spine lesions "never appear as an artifact of aging, and, if consistent with the results of a history and neurological examination, compel the diagnosis of MS"; (iii) Ms. Zurndorfer's diagnosis – primary-progressive MS – was full supported by medical literature and her clinical course; (iv) Dr. Picone's documentation of Ms. Zurndorfer's symptoms was based not only on self-reports and observations made during regular medical appointments, but also on direct observation of Ms. Zurndorfer when she participated in events at the Gimbel Multiple Sclerosis Comprehensive Care Center as a volunteer; (v) that as a result of her professional and personal observations, Dr. Picone had concluded that "the work she was trying and failing adequately to do, was beyond her capacity" and that "she was putting herself in harm's way by persisting in working"; (vi) Unum erroneously asserted that "the progressive nature of [Ms. Zurndorfer's] symptoms" was "inconsistent with the relative constancy of her brain MRI's," because, in fact, "[MS] literature consistently supports that spinal cord disease correlates quite strongly with progressive [MS]; and (vii) Dr. Pascal's non-neurological observations with regard to his administration of the Mitoxantrone treatment (his only involvement with Ms. Zurndorfer's care) could not reasonably be elevated over those of Dr. Picone, a treating neurologist with

"intimate knowledge of the patient over time," and, in any event, his observation of a temporary, minor improvement in ambulation was "not inconsistent with the primary progressive nature of [Ms. Zurndorfer's] disease" and "certainly are not an assessment of Ms. Zurndorfer's work capacity."

42.     The additional information was referred back to Unum's Dr. Neuren for review, who again concluded that the available MRI evidence (both brain and cervical) was "not adequate to make a diagnosis of progressive multiple sclerosis," at least not in the absence of "continued progression of disability for one year."  As to the latter, Dr. Neuren refused to accept Dr. Picone's report of such progression, because, purportedly "Dr. Pascal's records and letter indicate there was no change in the insured's status."

43.     Based on Dr. Neuren's analysis, Unum again reaffirmed its termination of benefits in a letter, dated January 23, 2004, and again asserted that the initial approval of benefits was "precipitated by her need for shoulder surgery rather than a worsening of her MS symptoms."

44.     Upon information and belief, Unum did not, prior to its January 23rd determination, seek the opinion of an independent medical expert, made no request to personally examine Ms. Zurndorfer, and conducted no investigation to corroborate whether disabling symptoms had been observed by her co-workers.

45.     In response to Unum's invitation to submit additional information, Ms. Zurndorfer provided a further letter from Dr. Picone, dated January 22, 2004, defending her diagnosis of MS, which was "based upon [her] close observation of the progression of [Ms. Zurndorfer's] symptoms for more than a year, knowledge of her family history, and, most important, MRI results which showed demyelinating lesions in the cervical spine," which are

given "disproportionate weight in arriving at a differential diagnosis as these lesions are more specific to MS and their meaning is less likely to be confounded by the patient's age" – a diagnosis which was independently arrived at by another neurologist, Lucien Cote, M.D., at the Neurologic Institute at Columbia University.  Dr. Picone also defended her clinical categorization of Ms. Zurndorfer's MS as "primary progressive" under clinical criteria generally accepted in the medical community.  In response to the claim that no clinical observations of progressive symptoms were noted, Dr. Picone pointed out that both she and another physician at the Gimbel Center recorded progressive MS symptoms during regular medical visits on August 5, 2002, and on October 2, 2002.  Similarly, in response to the claim that no neurological findings had been made, Dr. Picone pointed out that a neurological examination was performed, *inter alia*, on October 2, 2002, which demonstrated abnormalities, including mild left nystagmus, exaggerated reflex responses with accompanying clonus, decreased sensation to vibration in the extremities, spastic gait, and foot dragging.  Dr. Picone included relevant scientific literature.

46. Ms. Zurndorfer also submitted a personal statement, dated February 5, 2004, which (i) disclosed her brother's death of chronic progressive MS in 1996), (ii) described her limitations with regard to walking (must sit and rest after 2 blocks, due to fatigue, and must be extremely careful due to the propensity to lose her balance), and stair climbing (which she generally avoids, preventing her use of the subway system), and (iii) explained that these limitations significantly impeded her ability to commute to and from her office, as well as her ability to travel to and attend the client meetings required by her occupation. To refute Unum's new assertion that she was indeed able to work when she left her job in August, 2002, Ms. Zurndorfer also submitted statements of a supervisor and co-worker from CSC describing their observations.  Jennifer Kenton, in a Statement dated January 20, 2004, affirmed that she hired

and managed Ms. Zurndorfer and had the opportunity to observe her since 1998.  Her supervisor reported that in the Spring of 2002, she was "struck by a change – she was visibly dragging her leg when she walked" and "was clearly having a hard time getting around" and that by the summer of 2002 she had received reports that Ms. Zurndorfer was having a difficult time doing her work and that her productivity had suffered.  Her coworker attested to the drop in Ms. Zurndorfer's business activity and her inability to maintain balance even while standing to wait for a cab.

47. Ms. Zurndorfer's claim, with the additional information, was again forwarded to Unum's Dr. Neuren for review, who summarily concluded on or about February 8, 2004, that "there are no records that would support the R&L's [restrictions and limitations] as of 05/23/03."

48. Ms. Zurndorfer's claim was also reviewed by a Unum senior vocational rehabilitation consultant, Richard Byard, JD, MS, CRC, who, in response to a specific inquiry from the claim examiner, opined on or about February 27, 2004, that walking and stair climbing were not "material and substantial duties of the claimant's occupation"

49. By letter, dated March 1, 2004, Unum again reaffirmed its termination of disability benefits, concluding that "the medical records to not support any restrictions or limitations as of 5/23/03 that would have prevented Ms. Zurndorfer from returning to work in her prior capacity as an Account Manager/Sales Representative," "[s]he had demonstrated her ability to perform her occupation prior to her surgery and the medical evidence is not consistent with a significant change in her MS condition as of 5/23/03 to explain her inability to return to work," and "the specific difficulties that she describes regarding her ability to work appear specific to her job and not the occupation as a whole."  Unum contended that Ms. Zurndorfer's occupation in the national economy (as opposed to the regional economy) would not require

walking and stair climbing as essential duties, and did not address her general fatigue.

50. Ms. Zurndorfer has exhausted the administrative remedies provided by the Plan and required by ERISA.

51. Ms. Zurndorfer is entitled to disability benefits under the terms of the Plan.

52. Upon information and belief, Unum's termination of benefits is arbitrary and capricious, wrongful, improper, and in violation of the terms of the Plan, because, *inter alia*, (i) although it first deemed Ms. Zurndorfer's medical evidence of disability satisfactory and approved both short term and long term benefits thereon, it subsequently terminated benefits even though the quality of Ms. Zurndorfer's medical evidence did not change, nor did she experience a substantial improvement in her MS or symptoms; (ii) it has recharacterized its original approval of benefits as based on Ms. Zurndorfer's shoulder surgery when, in fact, that approval was clearly based on the progressive symptoms of her MS; (iii) it ignored the opinions of Ms. Zurndorfer's long-term treating physician and chose instead to rely on the opinions of its own in-house nurses and physicians (some of whom had no relevant expertise), without benefit of an independent medical opinion or a direct physical examination of Ms. Zurndorfer; and on a hematologist who was not as familiar with Ms. Zurndorfer and was evaluating her for other purposes; (iv) it completely ignored Ms. Zurndorfer's self-report, as well as the reports of her co-workers, regarding the substantial impact of her illness on her ability to perform her occupational duties; (v) it ignored, and failed to investigate or contradict, the evidence submitted by Ms. Zurndorfer regarding the actual demands of her occupation as performed in the relevant labor market; and thereby ignored the Plan's definition of "regular occupation" as "the occupation you are routinely performing when your disability begins"; (vi) it supported and facilitated Ms. Zurndorfer's successful Social Security disability claim – which required her to satisfy the far

more difficult standard of unable to engage in "any substantial gainful activity" – without even attempting to explain why it reached a contrary conclusion that Ms. Zurndorfer could not only perform "substantial gainful activity," but could in fact perform her own "regular occupation"; (vii) when CSC directly communicated to Unum that Ms. Zurndorfer's occupational difficulties had been observed by the company and her coworkers, it ignored this information and made no effort to investigate or corroborate these difficulties; (viii) despite the massive evidence of Ms. Zurndorfer's progressive MS symptoms, documented by her treating MS specialist, herself, and her co-workers, Unum chose instead to rely on selective and incorrect reading of the records of a peripheral treating physician, who specifically disavowed Unum's effort to read his chart as indicating Ms. Zurndorfer's ability to perform her occupational duties; (ix) challenged the MS diagnosis of a specialist in MS, based solely on the opinion of a staff general neurologist; (x) conducted secret roundtables at which strategies regarding the handling of Ms. Zurndorfer's claim were discussed by undisclosed parties.

53.  As a result of Unum's actions, Ms. Zurndorfer has been damaged in the total amount of $44,747.34, constituting unpaid long term disability benefits accrued to date (through April 13, 2004) under the Plan, and will continue to be damaged in the amount of $4,067.94 for each subsequent month in which benefits are not paid.

**WHEREFORE**, plaintiff demands judgment

on her first cause of action against Unum, awarding her not less than $44,747.34, plus $4,067.94 for each additional month after April 13, 2004, that accrues until the date of judgment, with pre-judgment interest from the accrual date of each benefit payment,

together with her reasonable attorneys' fees and costs incurred in this litigation and such other, further and different relief as to the Court may seem just, proper, and equitable.

Dated:     New York, New York
           May 6, 2004

_____
MARK SCHERZER, ESQ. (MS-2622)
Attorney for Plaintiff
29 John Street, Suite 1103
New York, New York 10038
Tel: (212) 406-9606