UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

SUSAN ZURNDORFER,                                    :

                                Plaintiff,        :        04 CIV 3497 (RCC)

        -- against --                             :

UNUM LIFE INSURANCE COMPANY    :
OF AMERICA, d/b/a UNUM PROVIDENT
                                                  :

                                Defendant.        :

-----------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT
ON THE RECORD**


MARK SCHERZER, ESQ. (MS-2622)
Attorney for Plaintiff
7 Dey Street, Suite 600
New York, New York 10007
Tel: (212) 406-9606

# TABLE OF CONTENTS

Counterstatement of Facts...................................................................................................... 1

ARGUMENT ......................................................................................................................... 9

   I.   A MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD IS
       APPROPRIATE ONLY AFTER THE COURT HAS DETERMINED THAT
       NEITHER PARTY IS ENTITLED TO SUMMARY JUDGMENT ................................. 9

   II.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE SHE HAS
       ESTABLISHED ON THE UNCONTESTED FACTS THAT UNUM'S SUDDEN
       REVERSAL AND TERMINATION OF HER DISABILITY BENEFITS WAS
       ARBITRARY AND CAPRICIOUS .................................................................................. 10

      A.   While Unum's Determination is Entitled to Deference, the Court Does Not Owe
           Abject Obeisance to Unum's Decision and Reasoning .................................................. 10

      B.   Ms. Zurndorfer's Claim, and Unum's Approval for Short and Long Term Disability
           Benefits, Was Based on Her MS Symptoms, Not Her Shoulder Surgery .................... 11

      C.   Like its Administrative Review, Unum's Motion Papers Ignore Relevant Evidence .. 12

      D.   Like its Administrative Review, Unum's Moving Papers Selectively Cull the Record
           for Evidence Supporting its Termination of Benefits .................................................... 15

      E.   There is No Basis for Unum's Claim that "No Fewer Than 4 Medical Experts"
           Supported Its Decision to Terminate Disability Benefits ............................................. 18

      F.   Unum's Determination that Ms. Zurndorfer was No Longer Disabled Failed to
           Consider Relevant Factors and was Not Supported by Such Evidence that a
           Reasonable Mind Would Accept as Adequate ............................................................. 22

CONCLUSION ...................................................................................................................... 25

**<u>TABLE OF AUTHORITIES</u>**

<u>Cases</u>

<u>Connors v. Connecticut Gen. Life Ins. Co.</u>, 272 F.3d 127 (2nd Cir. 2001) ............................ 21, 22

<u>Cox v. Washington Nat'l Ins. Co.</u>, 520 S.W.2d 76 (Mo. App. 1975) ............................................. 23

<u>Cunningham v. The Paul Revere Life Ins. Co.</u>, 235 F. Supp. 2d 746 (W.D. Mich., 2002) ......... 23

<u>Gallo v. Amoco Corp.</u>, 102 F.3d 918 (7th Cir. 1996) ..................................................................... 10

<u>Hackett v. Xerox Corp. Long-Term Disability Income Plan</u>, 315 F.3d 771 (7th Cir. 2003) ........ 10

<u>Hammer v. First Unum Life Ins. Co.</u>, 2004 U.S. Dist. LEXIS 16893 (S.D.N.Y.
 Aug. 25, 2004) ............................................................................................................................. 9

<u>Harris v. First Unum Life Ins. Co.</u>, 2004 U.S. Dist. LEXIS 10245 (N.D.N.Y., June 4, 2004),
 *aff'd*, 2004 U.S. App. LEXIS 20870 (2nd Cir., Oct. 4, 2004) (unpublished opinion) ................. 9

<u>Hess v. Hartford Life & Accident Ins. Co.</u>, 274 F.3d 456 (7th Cir. 2001) .................................... 10

<u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62 (2nd Cir. 2001) ............................................................... 10

<u>Holzschuh v. Unum Life Ins. Co.</u>, 2002 U.S. Dist. LEXIS 13205 (E.D. Pa.,
 July 17, 2002) ........................................................................................................................ 12, 22

<u>Kunstenaar v. Connecticut General Life Ins. Co.</u>, 902 F.2d 181 (2d Cir. 1990) ......................... 13

<u>Ladd v. ITT Corp.</u>, 148 F.3d 753 (7th Cir. 1998) .......................................................................... 14

<u>Lauder v. First Unum Life Insurance Co.</u>, 248 F.3d 375 (2nd Cir. 2002) .................................... 12

<u>Locher v. Unum Life Ins. Co. of Am.</u>, 389 F.3d 288 (2nd Cir. 2004) ........................................... 14

<u>McDonald v. Western-Southern Life Ins. Co.</u>, 347 F.3d 161 (6th Cir. 2003) .............................. 11

<u>McGuigan v. Reliance Standard Life Ins. Co.</u>, 2003 U.S. Dist. LEXIS 17593 (E.D. Pa.,
 Oct. 6, 2003) .............................................................................................................................. 23

<u>Miller v. United Welfare Fund</u>, 72 F.3d 1066 (2nd Cir. 1995) ...................................................... 23

<u>Monahan v. New York City Dep't of Corrections</u>, 214 F.3d 275 (2nd Cir. 2000) ........................ 10

<u>Muller v. First Unum Life Ins. Co.</u>, 341 F.3d 119 (2nd Cir. 2003) ................................................. 9

Pelchat v. Unum Life Ins. Co. of America, 2003 U.S. Dist. LEXIS 8095 (N.D. Oh., Mar. 25, 2003)............................................................................................................ 20, 22

Quigley v. Unum Life Ins. Co. of America, 340 F. Supp. 2d 215 (D. Ct. 2004)......................... 21

Saliamonas v. CNA, Inc., 127 F. Supp. 2d 997 (N.D. Ill., 2001) ................................................. 23

Shipp v. Provident Life & Acc. Ins. Co., 214 F. Supp. 2d 1241 (M.D. Ala., 2002).................... 23

Wilkes v. Unum Life Ins. Co. of Am., 2002 U.S. Dist. LEXIS 8763 (W.D. Wis., Jan. 29, 2002)............................................................................................................................ 6

## Other Authorities

11/18/03 Report of the Targeted Multistate Market Conduct Examination ................................. 22

## Regulations

29 CFR §§2560.503-1(h)(3)(ii) ..................................................................................................... 18

29 CFR §§2560.503-1(h)(4) ......................................................................................................... 18

## Internet Information

http://www.msaa.com/faq.html..................................................................................................... 18

http://www.nationalmssociety.org/Brochures-HCProvider.asp..................................................... 18

## Counterstatement of Facts

Defendant's entire argument for "judgment on the administrative record" starts from a falsified premise: that Ms. Zurndorfer "initially claimed to be disabled due to a bone spur in her shoulder that required surgery;" that Unum granted a short term of disability arising out of that limited claim; and that Ms. Zurndorfer switched gears when her benefits "were scheduled to end," only then claiming "that she could not return to work due to multiple sclerosis." (Unum Moving Memo., p. 3.) By recasting history in this way, Unum tries to avoid the effect of its own sudden and arbitrary reversal of course: first explicitly recognizing the debilitating effects of her MS in approving long term disability benefits, helping her obtain Social Security Disability ("SSD") benefits for a total and permanent disability based on MS, taking legal advantage of the MS-associated basis of her disability by imposing a pre-existing condition limitation on a portion of her benefits, and then changing its mind and abruptly terminating her benefits without identifying any improvement in the MS symptoms it initially cited as justifying her claim.

Unum supplies no page references in the administrative record for its assertion that the disability claim was initially made or approved based upon the shoulder surgery. That is because there are none. In extending short term disability benefits through December 13, 2002, Unum relied on the opinion, dated October 18, 2002, of Nurse Diana Martin, who found disability based on Ms. Zurndorfer's MS-related symptoms and not, either exclusively or even prominently, on her shoulder surgery:

> Reviewed office notes from 10/02, noting progressive MS, with increased gait difficulty, decreased stamina, continued with PT ?AFO [ankle-foot orthoses] brace, stairs, fatigue major issue Exam – CN [Central Nervous System] – mild nystagmus, to left, increased reflexes with clonus, sensation decreased, gait antalgic.
>
> Impression: Based on clinical exam findings in setting of MS, R&L's [restrictions and limitations] of limited walking, standing, sustained activities

related to fatigue, gait disturbance, drop foot, and continued treatment/PT [physical therapy] would support impairment an additional 8 weeks.

(R19.) Unum grossly distorts Nurse Martin's opinion, claiming that, in her view, "it was reasonable to allow plaintiff additional time to recover from the shoulder surgery 'in the setting of [multiple sclerosis].'" (Unum Moving Memo, p. 4.) Nurse Martin's determination was actually that Ms. Zurndorfer's ability to work was restricted by "limited walking, standing, sustained activities related to fatigue, gait disturbance, drop foot, and continued treatment/PT." In other words, Ms. Zurndorfer was suffering disabling symptoms specifically related to her MS.

Nurse Martin's opinion was explicitly based on "clinical exam findings in setting of MS," (R. 19) not, as claimed by Unum, "the shoulder surgery in the setting of" MS. These clinical exam findings are specified in the prior paragraph, namely: "Exam – CN [Central Nervous System] – mild nystagmus, to left, increased reflexes with clonus, sensation decreased, gait antalgic." In short, Ms. Zurndorfer's short term disability benefits were claimed and approved on the basis of MS-related symptoms.

The same is true of Ms. Zurndorfer's long term disability benefits. On the initial claim form, Ms. Zurndorfer's treating neurologist, Dr. Picone, listed the primary diagnosis as "MS," with the shoulder surgery listed as a "secondary contributing condition." Dr. Picone described her symptoms as "weakness LLE [lower left extremity], fatigue, diminished stamina, pain, balance, foot drop," reported objective findings that included "brisk reflexes, nystagmus, clonus, ↓ [decreased] sensation, ataxic gait, MRI brain, C spine + [positive for demyelinating plaques characteristic of MS]," and set forth her restrictions and limitations as "unable to walk long distances; unable to do stair; cannot lift or carry heavy objects; unable to do any activity requiring balance…, patient falls frequently 2° [secondary to] foot drop; she must rest at specified intervals; unable to use subways 2° [secondary to] stairs." (R161-62.) In response to

the question "why are you unable to work?" Ms. Zurndorfer explained on the "employee" portion of the initial claim form that she suffered "increasing difficulty in walking, disabling fatigue" and that at the time she stopped working, she "walked less" and was "unable to carry briefcase." (R163.) Thus, contrary to Unum's assertions, Ms. Zurndorfer's long term disability claim was premised primarily on a constellation of MS-related symptoms – gait disturbance, foot drop, fatigue, diminished stamina, left lower extremity weakness, pain, and imbalance – with her shoulder weakness (and consequent inability to carry objects) constituting a clearly secondary, and proportionately minor, factor.

Nurse Martin's analysis, the initial claim forms, and Dr. Picone's medical records comprise the only information in the record relating to her claim when Unum approved long term disability benefits at a roundtable meeting on October 29, 2002 (R18.), telephonically communicated to Ms. Zurndorfer on that same date (R28.), and communicated in writing on November 11, 2002. (R29-31.) Although the roundtable notation and the letter are silent with regard to Unum's reasoning, claim examiner Janet Nicholas's notation regarding her telephone notification to Ms. Zurndorfer does set forth the reasoning:

> I spoke with insured 10/29/02 and this is the first opportunity to document this file.
> November 2000 dx [diagnosed] with MS. She had rt shoulder surgery – bone spur in August 2002. Condition progressively got worse with increased gait difficulty, decreased stamina. She is currently in physical therapy for her shoulder and her walk. Her left leg has drop foot action and dragging. As a form of treatment she was receiving chemo 8 treatments that began in 8/2/02 [sic] rendered by Dr. Mark Pascal. Her next appointment won't be until approx 4/03 which has not been scheduled….
> Occupation: She cannot visit customers and remain at fast pace. She feels unbalance and unsteady on her feet….
> We are approving her claim and will continue to monitor her condition.

(R28.) On November 5, 2002, Ms. Nicholas noted that "insured has MS reasonable to be disabled until next doctor's appointment 04/03," a determination that was reviewed and

approved by Jennifer Wheeler, who apparently was a direct supervisor of Ms. Nicholas. (R34.) This same information was reported to the Unum employee responsible for the short term disability claim on December 9, 2002: "I advised based on our roundtable meeting on 10/29/02 we accepted her LTD claim to her next doctor's appointment in April 2003." (R54.) It is thus clear that in its approval of long term disability benefits, too, Unum relied principally on Ms. Zurndorfer's MS-related symptoms and viewed those symptoms as 'reasonably' supporting her disability through at least April, 2003.

According to Unum's November 11th approval letter, the only unresolved question was Ms. Zurndorfer's entitlement to increased payments under an enrollment form she had submitted for a 66⅔% benefit in January, 2002.[1] (R29: "[Y]our claim for Long Term Disability (LTD) benefits has been approved at the 50% level while we determine if your medical condition is pre-existing.") To determine that question, Unum directed a medical review for purposes of which the "condition(s) for which claimant is filing for disability benefits" was described as "Primary – Multiple Sclerosis," with no other condition recorded (R62). Unum asked its reviewer to determine whether MS was a "condition(s) for which claimant received treatment, consultation, care or services including diagnostic measures, or took medicines, in the Pre-ex period" and then posed as the ultimate question whether the condition for which the disability was claimed was "caused by, contributed to by, or resulted from" the condition for which treatment was received in the Pre-ex period. (Id.)

After receiving additional medical records, on January 28, 2003 – 5½ months after her shoulder surgery, and 4 months after what Unum claims it considered a reasonable recovery period – Unum wrote to Ms. Zurndorfer, stating that "we have completed the review of your

---

[1] Standard benefits under the Plan are 50% of pre-disability income. (R279.)

claim for Long Term Disability benefits," and declined to pay benefits of more than 50% of predisability income. The stated basis for Unum's partial denial was that Ms. Zurndorfer had "submitted a claim with a <u>primary diagnosis</u> of multiple sclerosis with a disability date of August 16, 2002," that "information gathered during our investigation supports that you were treated by Northern New Jersey Cancer Associates on December 19, 2001 for multiple sclerosis" and, consequently, "we must deny the requested increase to 66⅔%." It assured Ms. Zurndorfer, however, that "we will pay your claim at 50% as long as you meet the definition of disability." (R66-68.)

Significantly, the January 28th letter asserted that all unresolved aspects of Ms. Zurndorfer's claim had been reviewed and determined, that UNUM had determined that Ms. Zurndorfer was disabled, and that this disability was premised and approved on the basis of Ms. Zurndorfer's MS-related symptoms[2] – thus justifying Unum's denial of the added benefit on "pre-existing condition" grounds. Had Unum approved Ms. Zurndorfer's long term disability because of her shoulder spur and surgery, her prior treatment for multiple sclerosis would not have been a basis for denying the 66⅔% benefit.

Unum misleadingly attempts to gloss over these indisputable facts. It asserts that based on "Nurse Martin's opinion …, Unum approved plaintiff's claim through December 13, 2002," that it "informed [Ms. Zurndorfer] that, 'in order to qualify for ongoing benefits, [plaintiff] must continue to meet the definition of disability in [the] contract,'" and that it "continued to pay benefits thereafter while it gathered information and evaluated plaintiff's claim." Unum implies that its next action on the claim was when it "asked Janice Albert, a nurse…, to review plaintiff's

---

[2] Unum's denial of the 66⅔% benefit because of a pre-existing condition of MS also gives the lie to later efforts by Unum's in-house medical reviewers to question whether Ms. Zurndorfer's physicians had a reasonable basis to diagnose MS.

medical records on May 14, 2003." (Unum Moving Memo., p. 4.) Unum thus admits to only one approval when, in fact, it approved Ms. Zurndorfer's claim three times (once for short term benefits through December 13, 2002, and then, on at least two distinct occasions, for long term disability benefits through April, 2003[3]). It fails to acknowledge (i) that these approvals were specifically premised on her MS-related symptoms; (ii) that its approvals were not subject to any reservation of rights except with regard to the validity of a benefit increase application (R29-31, 66-68.), and (iii) that the negative determinations of Nurse Albert and Dr. Krell in May, 2003, were not based on new or more complete information, but instead simply on a new analysis of the information which was the basis of Unum's prior approvals.[4] When Ms. Nicholas called to

---

[3] These determinations also demonstrate that Unum understood, despite the contrary insinuation, at several points in its brief, that a 6-month interval between medical appointments was consistent with Ms. Zurndorfer's disability claim. (*See, e.g.*, Unum Moving Memo., p. 15: "Dr. Picone said she did not need to see plaintiff for this purportedly 'disabling' condition for six months.") Unum, fully aware of this interval, approved disability benefits for the entire period. Significantly, Unum does not claim, nor can it, that any medical professional with relevant expertise opined that the interval between appointments was medically inappropriate or otherwise inconsistent with Ms. Zurndorfer's disability claim.

[4] Unum's effort to hide its actual decision-making process is replicated in the "roundtable" procedure it employed for handling the long term disability portion of this claim. Except for a single one-sentence notation by Ms. Nicholas, neither the court nor plaintiff would know that such a meeting had occurred. (R18.) Yet, it is clear from Ms. Nicholas's communication of the approval decision to Ms. Zurndorfer on the same date (R28.) that this meeting was precisely when and where Unum approved her claim. Unum's failure to record the substance of this meeting, the analysis or reasoning underlying the roundtable's discussion (except what can be gleaned from Ms. Nicholas's telephone communication to Ms. Zurndorfer), or even the roundtable's participants, especially when coupled with the collective amnesia regarding this roundtable, and others, conducted in relation to Ms. Zurndorfer's claim (Scherzer Moving Aff., sworn to on April 13, 2005, Ex. 3, Unum Interrogatory Responses #1 and #2.), must be viewed as deliberate concealment. The roundtables here functioned as "black box" meetings, where critical decisions were made, yet the issues considered, the discussion that occurred, and even the participants therein, remain a total mystery. Another such meeting, where it was determined to "have medical review," occurred on or about April 30, 2003, and immediately preceded the negative reviews by Nurse Albert and Dr. Krell, who may very well have participated in the roundtable and strategized about the handling of Ms. Zurndorfer's claim. *See, e.g.,* Wilkes v. Unum Life Ins. Co. of Am., 2002 U.S. Dist. LEXIS 8763 (W.D. Wis., Jan. 29, 2002) (Dr. Krell participated in a roundtable immediately preceding a medical review in

notify Ms. Zurndorfer about the termination of benefits, the latter inquired "why [Unum] didn't act sooner, why [is Unum] making [its] decision now," to which Ms. Nicholas replied: "I confirmed we had this information at onset, but it was not properly reviewed."[5] (R1066.)

Unum's claim that its initial approval was based on Ms. Zurndorfer's shoulder surgery is also belied by the terms of its approval. Although Nurse Albert claimed that the "[r]easonable recovery time for her surgery would be 4-6 weeks" (R82. *See also*, R1066.), Unum approved benefits well beyond that period of time. Based on her August 16th surgery (R508-09.), Ms. Zurndorfer should have been able to work as of mid to late September according to Unum. Nonetheless, Nurse Martin approved short term disability benefits through mid-December, 2002, while the October 29th roundtable (well after the purported recovery period[6]) approved long term disability benefits through April, 2003.

When Unum suggested that Ms. Zurndorfer apply for Social Security Disability benefits (which could only be awarded for a disability rendering her unable to engage in substantial gainful employment for a period expected to exceed one year) and supplied her with free advocacy by its own wholly owned subsidiary to make that argument to the federal government,

---

which he found work capacity, in reliance upon which the claimant's disability benefits were terminated).

[5] Ms. Nicholas, the central claim examiner throughout Ms. Zurndorfer's long term disability claim, and the only employee to candidly discuss the substance of Unum's decisionmaking, is no longer employed at Unum and could not be interviewed to provide information regarding the roundtables conducted in this case. (Scherzer Moving Aff., Ex. 3, Unum Interrogatory Responses #1 and #2.) Although Unum was asked to "identify" each person who participated in the roundtables, it did not provide the "present or last known address" of Ms. Nicholas, making it impossible – despite significant efforts – to locate Ms. Nicholas. (Scherzer Opposition Affidavit, sworn to on May 19, 2005, ¶3.)

[6] Although a claim examiner offered a conflicting assessment, reporting that "the typical recovery period for this type of surgery is 6 to 8 weeks for a light occupation" (R107.), this still would only have supported benefits through mid-October, 2002.

it certainly did not have Ms. Zurndorfer's shoulder surgery, with its purported 4-6 week recovery period, in mind.  (*See* Plaintiff's Rule 56.1 Statement, ¶¶68-74.)

The balance of Unum's fact discussion quotes at length the opinions it elicited beginning in May, 2003, from its own staff – none of whom have any reported experience in MS treatment and none of whom examined Ms. Zurndorfer – on which it relied in denying Ms. Zurndorfer's claim and repeatedly upholding that denial.  (Unum Moving Memo., pp. 5-12).   Although Unum, in this portion of its factual recitation, does not seek to bury the determinations of its staff in the way it tried to bury their initial approvals of Ms. Zurndorfer's claim, it nonetheless fails to acknowledge that these later opinions – purportedly finding insufficient evidence to substantiate disability – were not based on any asserted improvement in Ms. Zurndorfer's MS symptoms from August, 2002.  Rather, these opinions were premised on the assertion – inconsistent with its own approval of benefits – that Ms. Zurndorfer had suffered no progression in symptoms from time of diagnosis in 2000 to her August, 2002, disability date.  Unum also fails to acknowledge the ways in which it shifted ground in justifying its denial – from disputing the diagnosis of MS (R1333; Unum Moving Memo., p. 8.) to disclaiming reliance on that argument and instead relying on an asserted ability to perform the duties of her occupation with her MS symptoms (R1310-1313, Unum Moving Memo., p. 12.).

Unum approved and paid benefits through May, 2003, without any reservation of rights.  The question which Unum then had to determine is whether Ms. Zurndorfer was disabled under the terms of the Plan as of May, 2003, and the question for this court is whether Unum's termination of benefits at that time was arbitrary and capricious.  Dr. Neuren, in his ultimate opinion, concluded that "[t]here are no records that would support the R&L's [restrictions and limitations] as of 05/23/03."  (R1341.)  However, Ms. Zurndorfer's report that by then she could

rarely leave home, the report of Dr. Picone that by then Ms. Zurndorfer required an orthotic

device to walk and was just shy of becoming wheelchair dependent, and the letter of Dr. Pascal,

opining that she was then currently disabled  (Plaintiff's Rule 56.1 Statement, ¶¶29-34.), all

confirm that Ms. Zurndorfer's symptoms had indeed progressed yet further.  Unum has cited no

contrary medical evidence reflecting her condition as of May, 2003.

## ARGUMENT

I.    **A MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD IS APPROPRIATE ONLY AFTER THE COURT HAS DETERMINED THAT NEITHER PARTY IS ENTITLED TO SUMMARY JUDGMENT.**

Unum asserts that this case is "ripe for judgment on the administrative record."  (p. 14.)

Several district courts, citing the Second Circuit's decision in Muller v. First Unum Life Ins. Co.,

341 F.3d 119, 124 (2nd Cir. 2003), have held that a "motion for judgment on the record" is not

ripe until the court has first determined that summary judgment cannot be granted.  Harris v.

First Unum Life Ins. Co., 2004 U.S. Dist. LEXIS 10245 at *10-12 (N.D.N.Y., June 4, 2004),

aff'd, 2004 U.S. App. LEXIS 20870 (2nd Cir., Oct. 4, 2004) (unpublished opinion); Hammer v.

First Unum Life Ins. Co., 2004 U.S. Dist. LEXIS 16893, at *7-9 (S.D.N.Y. Aug. 25, 2004).  In

Muller, the Court condoned use of a motion for judgment on the administrative record only after

noting (i) that there is no explicit authority under the FRCP for such a motion and (ii) that it is

appropriate, when the circumstances dictate, to treat such a motion as one for summary

judgment.  341 F.3d at 124.  It held that the district court there was within its discretion to

entertain a motion for judgment on the administrative record because it "had already denied

summary judgment to First Unum on the very issue of whether Muller was disabled" and "no

further discovery had taken place since the denial of summary judgment."  Id.  In ERISA

benefits cases such as this, where the administrative record consists of over a thousand pages of

documentation, a procedure which first requires the parties to move for summary judgment and

to comply with Local Rule 56.1 serves the salutary purposes of that Rule, *i.e.,* "freeing district

courts from the need to hunt through voluminous records without guidance from the parties,"

Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2nd Cir. 2001); and "plac[ing] the responsibility on

the parties to clarify the elements of the substantive law which remain at issue because they turn

on contested facts," Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2nd

Cir. 2000). Moreover, the exercise of preparing a statement of facts with corresponding record

citations may also deter a party from playing fast and loose with its factual assertions.

## II.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE SHE HAS ESTABLISHED ON THE UNCONTESTED FACTS THAT UNUM'S SUDDEN REVERSAL AND TERMINATION OF HER DISABILITY BENEFITS WAS ARBITRARY AND CAPRICIOUS.

### A.   While Unum's Determination is Entitled to Deference, the Court Does Not Owe Abject Obeisance to Unum's Decision and Reasoning.

Unum's brief assumes that the Court will mechanically accept its factual

characterizations and *ex post facto* reasoning and overlook the internal inconsistencies of that

reasoning, the erroneous factual assumptions on which it is based, and the contrary evidence

which Unum ignored. Unum is entitled to no such rubber stamp of its decision-making:

> "'Deferential review is not no review,' and 'deference need not be abject.'" *Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456, 461 (7th Cir. 2001)* (quoting *Gallo v. Amoco Corp., 102 F.3d 918, 922 (7th Cir. 1996)).* In the instant case, the district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence-no matter how obscure or untrustworthy-to support a denial of a claim for ERISA benefits. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 774-75 (7th Cir. 2003)* ("Review under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject. Even under the deferential

review we will not uphold a termination when there is an absence of reasoning in the record to support it. The termination decision here is just such a decision.") (internal citation omitted)….

McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172-73 (6th Cir. 2003). Deferential review does not require the Court to accept Unum's unfounded assertions that Ms. Zurndorfer's disability claim was premised on her right shoulder surgery (Unum Moving Memo., pp. 3-4, 15.), or that she failed to submit evidence that her MS symptoms were disabling at the time she stopped working (*id.*, at pp. 17-19.). Deferential review does not require, either, that the Court accept Unum's self-serving interpretation of the notations of Dr. Pascal (the hematologist-oncologist who administered an anti-cancer drug that is also used to treat MS), or its assertion that his chart notations fully endorsed the assessment of Unum's medical directors that Ms. Zurndorfer was not disabled (*id.*, at pp. 3, 6-9, 15-16.).

There is no substantial evidence for those assertions by Unum. The administrative record instead discloses that Ms. Zurndorfer's claim, and Unum's approval, was based on her MS, that she submitted ample evidence that she was disabled at the time she stopped working , including, in addition to highly knowledgeable medical opinion, her own statements and those of her supervisor and co-worker, echoing the unsolicited opinion of her employer's human resources manager, which Unum inexplicably ignored, and that Dr. Pascal's chart notations were, at best, equivocal. He opined in a narrative letter that Ms. Zurndorfer was disabled. (*See* discussion, *infra*.)

**B.     Ms. Zurndorfer's Claim, and Unum's Approval for Short and Long Term Disability Benefits, Was Based on Her MS Symptoms, Not Her Shoulder Surgery.**

The facts demonstrating that Unum knew full well that its initial claim approval was based on MS, and that its later claim denial constituted an arbitrary and capricious reversal of

course, are set forth at length in the Counterstatement of Facts, above. Unum's own use of Ms. Zurndorfer's MS diagnosis to reduce her benefits, moreover, estops it from denying that MS was always the basis of her claim. Lauder v. First Unum Life Insurance Co., 248 F.3d 375, 381-82 (2nd Cir. 2002). *See generally*, Plaintiff's Moving Memo., pp. 23-24.

Unum has used several methods to try to insulate its decisions from review. Prominent in this case are its false characterization of the basis of its decision and glossing over what its actual decisions were. It has tried to take advantage of a practice of not memorializing the events, such as roundtable meetings, at which decisions regarding claims were actually made. Its deliberate shaping of the administrative record by picking and choosing which of its own actions it chooses to memorialize reflects the actions not of a disinterested fiduciary, but of a calculating adversary. It has been held that where "UNUM acted more like Plaintiff's adversary than an impartial judge of his claim for benefits… [c]ourts have admonished such behavior, and have considered such behavior as grounds for overturning a benefits decision." Holzschuh v. Unum Life Ins. Co., 2002 U.S. Dist. LEXIS 13205, at *24 (E.D. Pa., July 17, 2002).

The Court should not countenance Unum's effort to rewrite the history of Ms. Zurndorfer's claim to avoid the consequences of its arbitrary claim administration. Unum should be made to understand that being subject to the "arbitrary and capricious" standard of review does not constitute a license to act arbitrarily and capriciously, but rather carries with it an obligation to administer claims according to the highest standards of fiduciary care and honor.

### C. Like its Administrative Review, Unum's Motion Papers Ignore Relevant Evidence.

Unum's brief shares the fundamental inadequacies of its claim decision-making. As noted in plaintiff's moving memorandum of law (Pl. Moving Memo., pp. 9-10, 18-19.), there is no evidence that Unum ever considered the statements submitted by Ms. Zurndorfer, her

supervisor, or her co-worker.  Nor did it even momentarily pause to reconsider its termination of

benefits when Ms. Zurndorfer's employer expressed surprise at that decision and, in response to

Unum's reliance on her purported ability to work up through the date she commenced her

disability leave, spontaneously described the significant deterioration of Ms. Zurndorfer's ability

to perform her job duties before she stopped working.  Although Unum acknowledges receipt of

these statements (Unum Moving Memo., p. 11), its description of the subsequent analysis

performed by its claim examiner and Dr. Neuren is significant for the absence of any discussion

of them.  Were they reviewed or considered?  It is clear that Unum simply did not consider this

information "evidence."  (Unum Moving Memo., p. 18:  "Unum …several times invited her to

submit the specific information that might lead to a reversal of Unum's determination.  Plaintiff,

however, never submitted such information.")

Unum is not free to ignore such relevant evidence (Pl. Moving Memo., pp. 18-19.),

especially when it has adduced no basis for questioning the personal credibility of Ms.

Zurndorfer or her witnesses.  The Second Circuit recently rejected Unum's argument – that the

claimant could not be disabled because she continued to work through the date of disability –

where Unum, as here, leapt to that conclusion by ignoring contrary evidence:

> Relying on our decision in *Kunstenaar v. Connecticut General Life
> Insurance Co., 902 F.2d 181 (2d Cir. 1990)*, UNUM also argues that the District
> Court disregarded "clear precedent that an insured who works full time until
> quitting or being terminated cannot recover benefits, even if allegedly suffering
> from an illness at the time."  UNUM's statement of our precedent, however, is off
> the mark.  *Kunstenaar* does not stand for this proposition and is distinguishable
> from the instant case.  In *Kunstenaar*, we found that the claimant could not be
> considered disabled, because he had failed to present "any evidence" that he met
> his plan's definition of disability prior to his termination from employment, when
> his coverage under the plan at issue ended.  *Id.* at 184.  We also found it
> significant that the claimant had missed no work days as a result of his alleged
> disability and had consulted a doctor only after having been terminated for
> reasons unrelated to job performance.  *Id.* at 183.  Here, Locher submitted
> evidence of what her superiors called "excessive" unscheduled absences and

> medical appointments scheduled during the work day.  Accordingly, *Kunstenaar* provides no support for UNUM here. Moreover, as Locher points out, the argument pressed by UNUM would essentially put disability claimants in a "Catch 22" because those claimants who were working could not be considered disabled and yet claimants who had stopped working would not be covered under the Plan. Certainly, claimants who can establish absences and resignation based upon an inability to continue working should be able to claim that their disability prevented them from performing the duties of their occupation.

Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 297 (2nd Cir. 2004).  Here, Ms. Zurndorfer was receiving regular treatment for MS – including not only periodic administration of cancer chemotherapy drugs but daily self-injections of the MS drug, copaxone (R. 28), well before she stopped working.  She submitted substantial evidence, including physicians' letters, her own description, and co-worker/employer statements, that by the time she commenced her disability leave, the symptoms of her progressive disease significantly "limited [her] from performing the material and substantial duties of [her] regular occupation."  (Plan, R290.)

Also mirroring the administrative review, Unum's brief ignores and gives no consideration to Social Security's award of disability ("SSD") benefits, even though Unum induced and directly supported Ms. Zurndorfer's SSD claim, the Plan's "regular occupation" definition of disability presents an unequivocally lower threshold than Social Security's "any substantial gainful employment" standard, and Unum conceded that "it is rare for someone to have SSDI benefits approved on their initial application."  (R31.)  Under the circumstances, Unum acted arbitrarily in failing to give weight to this clearly relevant evidence.  (Pl. Moving Memo., pp. 19, 22-23.)  Unum's active support for the SSD claim not only renders the SSD award relevant, it also estops Unum from contesting Ms. Zurndorfer's disability.  Ladd v. ITT Corp., 148 F.3d 753, 755-56 (7th Cir. 1998).  *See also*, Plaintiff's Moving Memo., pp. 22-23.

**D.    Like its Administrative Review, Unum's Moving Papers Selectively Cull the Record for Evidence Supporting its Termination of Benefits.**

Contrary to Unum's assertions, plaintiff did not request that Unum "disregard Dr. Pascal's opinion" (Unum Moving Memo., p. 7.), but rather requested that it critically assess Dr. Pascal's chart notations and read them contextually in accordance with his limited involvement in Ms. Zurndorfer's treatment.  Instead, as reflected in its brief, Unum selectively relied on Dr. Pascal's notations to the exclusion of other relevant evidence and overreached to draw unjustified conclusions.

Most egregiously, Unum claims that it "relied upon the opinion of … Dr. Mark Pascal", implying that Dr. Pascal believed Ms. Zurndorfer not to be disabled.  (Unum Moving Memo., p. 3.)  However, the only opinion expressed by Dr. Pascal directly regarding disability in the administrative record was that as of June 5, 2003, "Ms Zurndorfer is disabled at this time and that will be further documented by Dr. Picone."[7]  (R. 869)  Dr. Pascal further observed that in the time after his "treatment ended approximately nine months ago," *i.e.*, in October, 2002, "she developed progressive neurologic problems" and "[h]er multiple sclerosis is worsening."  (*Id.*)

_____

[7] Dr. Pascal's contemporaneous chart notations do not justify Unum's assessment that he viewed her as fully able to carry out her work duties.  There is no evidence, as an initial matter, that he was aware of the requirements of Ms. Zundorfer's occupation.  Moreover, Unum principally relied on the Eastern Cooperative Oncology Group ("ECOG") patient performance ratings which Dr. Pascal recorded in his notations.  (Unum Moving Memo., p. 5.)  These notations actually support Ms. Zurndorfer's disability claim.  Dr. Pascal consistently rated Ms. Zurndorfer's ECOG score as "0-1" or "1," a score of 1 reflecting "Restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work."  Notably, a score of "2" reflects an inability to engage in any work.  Ms. Zurndorfer never claimed an inability to perform "any work," but rather specifically claimed an inability to perform the travel, walking, carrying, and stair-climbing aspects of her regular occupation.  A rating of "1" is thus wholly consistent with Ms. Zurndorfer's disability claim.  The 50% travel requirement of her regular occupation clearly does not qualify as "office work."  In short, Dr. Pascal's notations cannot be read as endorsing Ms. Zurndorfer's ability to engage in the walking, stair-climbing, and carrying activities that were required of her occupation.

In light of Unum's approval of disability benefits on three separate occasions during this period (October 18, 2002, by Nurse Martin; October 29, 2002, by an Unum roundtable; and January 28, 2003, in its letter determining the pre-existing condition issue), when, according to Dr. Pascal, Ms. Zurndorfer's MS condition was worsening, Unum's reliance on his "opinion" to terminate benefits in May, 2003, was patently misplaced.

Unum's effort to revisit the period prior to October, 2002, for which it approved and paid disability benefits, relies heavily on Dr. Pascal's statement that "while under Mitoxantrone treatment [*i.e.,* from December, 2000, through October, 2002] her MS stabilized," meaning "she did not improve but she did not get worse." (*Id.*) As noted in Plaintiff's Memorandum in Support of her Motion for Summary Judgment and discussed further, below, however, Dr. Pascal's observations were limited in scope and ambiguous in light of his other notes. But even if this observation of "stability" could be taken as the totality of his opinion regarding Ms. Zurndorfer, that stability could not be read, as Unum attempts to do, as suggesting the absence of disabling symptoms. A disinterested claim administrator would have had to recognize that Ms. Zurndorfer did struggle for months with her limitations before she had to give up her effort to remain employed. This commendable effort should not reasonably have been used against her. (*See* Pl. Moving Memo, pp. 14-15.) Perversely, Unum's position would reward employees who immediately elect to stop work and collect disability benefits, and penalize those, like Ms. Zurndorfer, who valiantly struggle to remain productive.

Unum's selective bias is also reflected in its hypercritical rejection of the opinion of Dr. Picone, a neurologist and experienced MS specialist, as contrasted with its eager and uncritical reliance on the notes of Dr. Pascal, a hematologist/oncologist whose treatment was limited to the IV administration of a chemotherapeutic cancer drug used as adjunct treatment for MS. Thus,

Unum even went so far as to question Dr. Picone's diagnosis of MS despite her detailed explanation of the basis for this diagnosis backed up by medical literature (Pl. Moving Memo., pp. 13-14.) and even though Ms. Zurndorfer's MS was determined by another Unum physician to be both the basis for her disability claim and a "pre-existing condition" as of January, 2002. (R66-68.)

Unum personnel not only misused Dr. Pascal's notations, *see* discussion *supra*, but they also overlooked glaring omissions from his record which call into question its thoroughness with regard to Ms. Zurndorfer's medical condition. For example:

> ● Dr. Pascal failed to note in his chart entry for October, 2002, that Ms. Zurndorfer had stopped working, had undergone surgery on her right shoulder, and was currently engaged in physical therapy. Indeed, his notation specifically asserts that her "past medical history, past surgical history, … occupational history … are all unchanged from the prior visit [in June, 2002] and as per the 12/21/00 note." (R370.)

> ● Dr. Picone's chart notation for June 14, 2001 observed that "Pt fell while walking to the [chemotherapy] infusion center," had a "bruised R knee" and "appears to have fluid on knee cap" (R129.). Dr. Pascal – who administered the infusion – made no mention of a fall or bruise, even though he specifically examined her knees as part of his examination: "there is some hyperreflexia of the knees and ankles." (R380-81.)

Dr. Pascal's chart notations were thus demonstrably less than comprehensive. They appear to reflect his limited involvement in Ms. Zurndorfer's care, restricted to monitoring responses and side effects attributable to the chemotherapeutic agent he was administering. Unum's exaggeration of Dr. Pascal's notations, coupled with its willingness to overlook the manifest omissions and inconsistencies in those notations, stands in stark contrast to the quibbling and carping directed at Dr. Picone. Unum's treatment of the medical evidence suggests the actions not of an even-handed fiduciary, but rather of a partisan advocate for a pre-ordained outcome – with its heavy thumb on the scales weighing against Ms. Zurndorfer's claim.

**E.     There is No Basis for Unum's Claim that "No Fewer Than 4 Medical Experts" Supported Its Decision to Terminate Disability Benefits.**

Unum misleadingly asserts that "no fewer than 4 medical experts" determined that Ms. Zurndorfer was not disabled under the terms of the Plan:  Nurse Albert, Nurse Grover, Dr. Krell and Dr. Neuren.   Three of those four "experts," the two nurses and Dr. Krell (certified in Family Medicine) clearly fail to satisfy the minimum requirements for expert reliability in claim review set by ERISA regulations.  29 CFR §§2560.503-1(h)(3)(ii), and (h)(4) ("in deciding an appeal that is based in whole or in part on a medical judgment … the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment").

The primary treating physician for MS is a neurologist[8] and, as reflected in the credentials of Dr. Picone, there are neurologists who specialize primarily in the treatment of MS. Dr. Picone thus has both appropriate training _and_ experience.  Although Dr. Neuren has appropriate training, there is no evidence in the record that he has any relevant experience in treating MS patients.  (Pl. Rule 56.1 Statement, ¶63[9]; Scherzer Moving Aff., Ex. 4.)  Thus, three

---

[8] _See, e.g._, http://www.msaa.com/faq.html ("A neurologist is the medical specialist who is trained to evaluate the symptoms of MS" and "[i]deally, … the neurologist is affiliated with an MS center, research facility, or a teaching hospital").  The National MS Society maintains a referral list of medical professionals interested in treating MS patients who must meet certain basic criteria:  "The neurologists (physicians who specialize in nervous system disorders) on our lists have affirmed that they:  are board certified or board eligible, are licensed by the state, have one or more hospital affiliations, have malpractice coverage, will prescribe the MS disease-modifying drugs when appropriate."  http://www.nationalmssociety.org/Brochures-HCProvider.asp.  Moreover, the first question a MS patient is encouraged to ask a prospective treating neurologist is:  "Approximately how many other people with MS does this provider see in a year?"  _Id._

[9] "Dr. Neuren has no reported experience treating MS patients. (Scherzer Moving Aff., Ex. 4)  None of his published materials appear to treat MS as a principal subject. (_Id._)  His curriculum vitae reflects no hospital affiliations after 1991, and he appears to have terminated his private treatment of patients and entered Unum's employ as a Medical Director in 2001.  (_Id._)"

of Unum's purported "experts" clearly do not qualify as appropriate decision-makers under ERISA regulations because of lack of appropriate training and experience, and the available evidence in the administrative record suggests that the fourth, Dr. Neuren, also fails to qualify because of his lack of appropriate experience. It is also significant that all four of these medical consultants are Unum employees and that Unum never sought an outside opinion or independent medical examination.

Also, while Unum touts these four opinions, it fails to acknowledge that at least three of its other reviewers explicitly or implicitly substantiated Ms. Zurndorfer's disability. Nurse Martin (R19.); the undisclosed medical consultant who likely participated in the roundtable approving Ms. Zurndorfer's claim for LTD benefits (R18; *see also* fn. 4, *supra*.); and Dr. Lani Graham, the physician who reviewed Ms. Zurndorfer's claim in relation to the "pre-existing condition issue," and who implicitly determined that Ms. Zurndorfer was suffering from MS in the period from October through December, 2001, and that MS was the basis of the disability claim for which benefits had been approved (R62.).

It is also significant that of the four medical consultants cited by Unum, none specifically and directly determined that Ms. Zurndorfer was able to do the substantial and material duties of her regular occupation. Rather, their conclusion was based on indirect reasoning, *i.e.*, that (i) Ms. Zurndorfer's MS did not limit her ability to work at the time she went on disability, and (ii) her condition, according to Dr. Pascal, had remained stable in the period leading up to, and shortly after, she stopped working. (Unum Moving Memo., pp. 8-9, 15-16.) Unum, however, inexplicably refused to consider evidence – such as Ms. Zurndorfer's own statements, those of her co-workers and employer, and the observations of expert neurologists who observed her closely around the time of her claim – that directly refuted the first step in this reasoning.

Having failed to consider the evidence submitted by Ms. Zurndorfer or to obtain any other evidence which disputed Ms. Zurndorfer's affirmative showing, it was unreasonable for Unum to conclude that Ms. Zurndorfer's MS was non-disabling at the time she stopped working. Unum's reasoning, based on a patently faulty premise, must collapse of its own weight.

To the extent Unum refused to consider the witness statements because they were not "objective" (Unum Moving Memo., p. 17.), its position cannot be sustained. The observations of Ms. Zurndorfer's human resources manager, direct supervisor and co-worker, none of whom have a stake in the matter or any professional obligation to Ms. Zurndorfer, are, indeed, objective observations.

To the extent that Unum's insistence on objective evidence has to do with corroboration by medical tests, it pushes any requirement for such tests articulated in other cases beyond the line of reason. Ms. Zurndorfer submitted MRI's demonstrating demyelenating disease,[10] and her physicians documented neurological symptoms, such as nystagmus, decreased sensation, abnormal reflexes, and observed gait disturbance. However, as to such symptoms as fatigue, which are not presently demonstrable by laboratory tests or other "objective" testing measures – it is completely unreasonable for Unum to deny the claim on the grounds that she has failed to provide "objective" evidence of such symptoms. Otherwise a claimant suffering such symptoms would never be able to prove a claim. Pelchat v. Unum Life Ins. Co. of America, 2003 U.S. Dist. LEXIS 8095, at *31-32 (N.D. Oh., Mar. 25, 2003) ("The problem with UNUM's apparent requirement of 'objective medical evidence' is that UNUM has identified no more 'objective' evidence that plaintiff could have submitted").

---

[10] Unum never refuted Dr. Picone's demonstration that its further insistence on showing a change in MRIs or confirming the diagnosis through spinal taps were unreasonable. As Dr. Picone pointed out, MS symptoms may progress without observed changes in MRI (R1087), and a painful, invasive spinal tap had no clinical utility in Ms. Zurndorfer's case (R1167).

Nothing in the Plan or applicable law supports Unum's insistence on the level of

objective proof it has demanded of Ms. Zurndorfer, when she has already amply corroborated her

subjective symptoms with objective evidence.  ,Indeed, it has been held reversible error for a

finder of fact to demand such proof exclusively.[11]  <u>Connors v. Connecticut Gen. Life Ins. Co.</u>,

272 F.3d 127, at 136-37 (2nd Cir. 2001).  *See also*, <u>Quigley v. Unum Life Ins. Co. of America</u>,

340 F. Supp. 2d 215, 224 (D. Ct. 2004) ("Where the record reveals well-documented complaints

of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the

---

[11] <u>Maniatty v. UNUM Provident Corp.</u>, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 Fed. Appx. 413 (2d Cir. 2003) (unpublished decision), *cert. denied*, 540 U.S. 966 (2003), cited by Unum (Unum Moving Memo., p. 17.), is not to the contrary.  The court in <u>Maniatty</u> held that the claim administrator was not required to credit the claimant's purely subjective complaints, *i.e.*, where "the only objective evidence in the administrative record regarding plaintiff's allegedly continuing back pain is an MRI that showed a 'small recurrent disc herniation' in 1998, well before defendants terminated their disability payments to plaintiff" and "all subsequent tests designed to uncover neurological damage were negative."  218 F. Supp. 2d at 504.

Given the Second Circuit's clear statement regarding the consideration of "subjective" evidence in Connors, Unum cannot reasonably argue that the district court decision in <u>Maniatty</u> establishes a different rule.  Indeed, the Second Circuit did not simply issue a summary affirmance in <u>Maniatty</u>, but instead held in an unpublished opinion:  "Having conducted a thorough review of the evidence adduced by plaintiff to support her claim of disability due to back pain, chronic fatigue syndrome, and fibromyalgia, we conclude that the administrator did not commit a clear error of judgment or otherwise abuse its discretion in finding that plaintiff had failed to demonstrate that she is unable to perform each of the material duties of her regular occupation because of injury or sickness."  2003 U.S. App. LEXIS 9383, at *413-414 (2nd Cir., May 15, 2003).  The Court's substitution of its own opinion would suggest that it was endorsing the result reached by the district court without necessarily endorsing its reasoning.

Other cases where an insistence on objective data have recently been upheld are similarly distinguishable.  In <u>Solaas v. Delta Family Care Disability</u>, 2005 U.S. Dist. LEXIS 5269 (S.D.N.Y., Mar. 29, 2005),  there was a complete absence of any objective tests or even medical records supporting the claim, and the claimant relied solely on a statement from a physician – the same chronic fatigue syndrome physician as in <u>Maniatty</u> – whose license to practice medicine was suspended in connection with fraudulent and incomplete diagnoses and failure to keep records. In <u>Winkler v. Metropolitan Life Ins. Co</u>., 2005 U.S. Dist. LEXIS 6738 (S.D.N.Y., Apr. 18, 2005) objective observers, such as the claimant's employer, who hired the claimant for freelance work after the asserted date of disability, contradicted the claimed disability.  Both are in stark contrast to Ms. Zurndorfer's well supported claim with its ample objective and subjective substantiation.

claim administrator, and the court, cannot discredit the claimant's subjective complaints"). If Unum intended to exclude or limit coverage of conditions with a subjective component, it could easily have written an explicit exclusion or limitation into the Plan. Pelchat, at *33 n.7 (Unum policy with provision imposing 12-month benefit limit on "disabilities due to sickness or injury which are primarily based on 'self-reported symptoms'"); Holzschuh, 2002 U.S. Dist. LEXIS 13205 at *4 (same). It did not.[12]

F.   **Unum's Determination that Ms. Zurndorfer was No Longer Disabled Failed to Consider Relevant Factors and was Not Supported by Such Evidence that a Reasonable Mind Would Accept as Adequate.**

In sum, Unum's termination of benefits was arbitrary not only because it constituted a sudden and unexplained reversal of course from its earlier approval of benefits or because it contradicted its own actions in fully supporting her Social Security disability claim and in denying her benefit increase because of her "pre-existing condition" of MS, but because Unum had no reasonable basis for concluding that Ms. Zurndorfer was no longer disabled. The Second Circuit has observed:

> In reviewing the administrator's decision deferentially, a district court must consider "whether the decision was based on a consideration of the relevant

---

[12] Unum's unsubstantiated and unreasonable insistence on "objective" evidence has been identified by state regulators as an "area of concern":

> The examination team identified a significant number of instances in which benefits were denied by the Companies on the grounds that the claimant had failed to provide "objective evidence" of a disabling condition. The Companies' policy forms do not require the claimant to provide such evidence.

(11/18/03 Report of the Targeted Multistate Market Conduct Examination, annexed to the Affidavit Mark Scherzer, sworn to on April 13, 2005, as Ex. 5, at pp. 8-9.) To the extent Unum and its in-house consultants refused to consider anything other than "objective" evidence, their opinions as to Ms. Zurndorfer's disability were unfairly and improperly skewed against a comprehensive consideration of her claim. As required by Connors, the court here must consider all the objective and subjective evidence.

factors."  A denial of a claim challenged under § 502(a)(1)(B) is arbitrary and capricious if "there has been a clear error of judgment," that is, if the decision was "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  Substantial evidence in turn "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance."

Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2nd Cir. 1995) (citations omitted).  Unum's termination of Ms. Zurndorfer's benefits fails to meet these standards.  It failed to consider relevant factors, such as (i) the unanimous and uncontradicted statements by Ms. Zurndorfer's employer, co-workers, and supervisor that she had become unable to perform her job responsibilities at the time she ceased working; (ii) Dr. Picone's assessment that Ms. Zurndorfer would be at risk of injury if she continued working (R1087)[13]; (iii) the Social Security Disability award in the preceding month; and (iv) Dr. Pascal's clear and uncontradicted opinion (wholly consistent with Ms. Zurndorfer's treating physician, Dr. Picone) that Ms. Zurndorfer was disabled as of May, 2003, when Unum terminated her benefits.  Moreover, the evidence Unum did rely upon was wholly inadequate to justify its conclusion that Ms. Zurndorfer was no longer disabled as of May, 2003.  The opinions of its own medical personnel were in conflict – later opinions implicitly or explicitly contradicting the earlier ones upon which approval of short and

---

[13]  Risk to health is as much a disability as physical inability to perform. McGuigan v. Reliance Standard Life Ins. Co., 2003 U.S. Dist. LEXIS 17593, at *16-17 (E.D. Pa., Oct. 6, 2003) (court deemed it unreasonable for claim administrator to ignore treating doctor's opinion that the risk of occupational stress to claimant's cardiac condition was a factor contributing to disability, rejecting claim administrator's argument that it was not required to consider "the possibility of a future deterioration of a person's health");  Cunningham v. The Paul Revere Life Ins. Co., 235 F. Supp. 2d 746, 757 (W.D. Mich., 2002) ("it was an abuse of discretion for [the claim administrator] to deny disability benefits without considering the stresses associated with [claimant's] occupation and its effects on [claimant's] cardiovascular health"); Shipp v. Provident Life & Acc. Ins. Co., 214 F. Supp. 2d 1241, 1249 (M.D. Ala., 2002) (same); Saliamonas v. CNA, Inc., 127 F. Supp. 2d 997, 1001 (N.D. Ill., 2001); Cox v. Washington Nat'l Ins. Co., 520 S.W.2d 76, 79 (Mo. App. 1975) (disability not precluded by return to work where claimant "did so only at the price of great pain and suffering and at the grave risk of endangering his health and life" and where "common care and prudence, under more fortuitous circumstances, would have dictated that he refrain from such activity").

long term disability benefits were made. The medical opinions that Unum did disclose and rely upon to terminate benefits were by personnel who lacked relevant qualifications and/or appropriate clinical experience. Those opinions, in any event, did not directly conclude that Ms. Zurndorfer was able to perform the duties of her regular occupation, but arrived at that conclusion by a chain of reasoning whose initial link, *i.e.*, that Ms. Zurndorfer, but for her shoulder surgery, was fully able to perform the duties of her regular occupation at the time she stopped working, was faulty and premised on Unum's failure to consider relevant evidence. The second link in that reasoning – Dr. Pascal's chart notations that Ms. Zurndorfer's medical condition remained relatively "stable" during the course of his administration of an anti-cancer chemotherapeutic agent used as adjunct treatment for MS – is also insufficient to justify the result reached by Unum and its medical personnel, in that, *inter alia*, (i) stability, where Ms. Zurndorfer submitted evidence that she was disabled during the baseline period, in fact confirms her ongoing disability; (ii) Dr. Pascal's ECOG ratings reflected his contemporaneous opinion during treatment that Ms. Zurndorfer was fit only for sedentary office work, which her occupation as an account representative was not; (iii) Dr. Pascal's medical chart was not comprehensive and must be viewed in the context of his limited role in Ms. Zurndorfer's treatment; and (iv) Dr. Pascal opined that Ms. Zurndorfer was fully and totally disabled for any work as of May, 2003, when Unum terminated benefits. "Substantial evidence" to support a claim determination cannot be a mere scintilla and must have some reasonable substance. The evidence on which Unum chose to rely does not.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for judgment on the administrative record should be denied and plaintiff's motion for summary judgment, requesting reinstatement and an award of disability benefits to date, should be granted, and plaintiff should be awarded interest, costs, reasonable attorneys fees, and such other, further and different relief as to the Court may seem just and proper.

Dated:        New York, New York
                May 20, 2005

Respectfully submitted,

_____/s/_____
MARK SCHERZER, ESQ. (MS-2622)
Attorney for Plaintiff
7 Dey Street, Suite #600
New York, New York 10007
Tel.: (212) 406-9606

**Of Counsel:**
- Mark Scherzer, Esq. (MS-2622)
- A. Christopher Wieber, Esq. (ACW-2077)