UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/08

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SUSAN ZURNDORFER,

        Plaintiff,

-  against -

UNUM LIFE INSURANCE COMPANY OF
AMERICA d/b/a UNUMPROVIDENT,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

04 Civ. 3497 (RJH)

**MEMORANDUM
OPINION AND ORDER**

Plaintiff Susan Zurndorfer ("Zurndorfer" or "plaintiff") worked at CSC

Corporation ("CSC") from 1998 until 2002. Defendant Unum Life Insurance Company

of America ("Unum") is the administrator of CSC's group life insurance and its short and

long-term disability insurance. Zurndorfer was diagnosed with Multiple Sclerosis

("MS") in November 2000. Her last day of work was August 15, 2002. On August 16,

Zurndorfer had surgery on her right shoulder. Upon the advice of her MS doctor, she did

not return to work. On November 11, 2002, Unum found that plaintiff was disabled

within the meaning of the long-term disability plan as of August 16, 2002. However, on

May 23, 2003, Unum terminated her benefits finding that plaintiff had not demonstrated

that she remained disabled.

Before the Court are defendant's motion for judgment on the administrative

record asking this Court to confirm the administrator's decision and dismiss the

complaint, and plaintiff's cross-motion for summary judgment seeking reinstatement of

her long-term disability benefits as of May 23, 2003.

## BACKGROUND[1]

### I. The Long-Term Disability Plan

Zurndorfer began working for CSC in March 1998. (Pl.'s 56.1 Statement ¶ 3.)

As a CSC employee, Zurndorfer received long-term disability ("LTD") coverage through

a policy issued to CSC by Unum. (*Id.* 13.) Under the plan, a covered employee is

disabled when Unum determines that the employee is:

> limited from performing the material and substantial duties of [her] regular
> occupation due to [her] sickness or injury; and [she has] a 20% or more
> loss in [her] indexed monthly earnings due to the same sickness or injury;
> and during the elimination period [she is] unable to perform any of the
> material and substantial duties of [her] regular occupation.

(R. 290.) The policy sets the elimination period at 90 days. (R. 290.) Regular

occupation "means the occupation [the employee is] routinely performing when [her]

disability begins." (R. 308.) Material and substantial duties are those that "are normally

required for the performance of [the employee's] regular occupation; and cannot be

reasonably omitted or modified." (R. 307.) Effective January 1, 2002 Zurndorfer

upgraded her coverage from a 50% benefit to a 66.666% benefit. (R. 41, 177–79, 290–

91.) This increase in coverage could not apply to pre-existing conditions. (R. 296.) An

employee has a pre-existing condition under the policy if she "received medical

treatment, consultation, care or services including diagnostic measures, or took

prescribed drugs or medicines in the 3 months just prior to the date [her] coverage

increased; and the disability begins in the first 12 months after [her] coverage increased."

(R. 296–97.) The policy grants Unum discretion to determine eligibility and to interpret

the terms and provisions of the policy. (R. 286; Pl.'s 56.1 Statement ¶ 17.)

---

[1] Unless otherwise indicated, the facts recited here are either taken from the administrative record ("R.") or
are undisputed characterizations of that record.

## II. Plaintiff's Occupation

From September 1985 until August 2002, Zurndorfer sold legal services in New York City, first with Commerce Clearing House and then with CSC. (R. 849.) Before that, Zurndorfer had been a teacher in New York City public schools for twenty-five years and had worked as a special events coordinator for three years. (R. 222; Pl.'s 56.1 Statement ¶ 2.) In March 1998, Zurndorfer began working at CSC as a sales account manager. (R. 221, 225.) CSC provides legal services to corporate law firms. (R. 1343.) At CSC Zurndorfer was essentially a sales person. (R. 1196, 1343.) Her territory covered midtown and lower Manhattan. (R. 1200, 1343.) She was to make an average of fifteen in-person sales calls each week to her clients, 45 top corporate law firms in New York City. (R. 849, 1200, 1220.) As a result, Zurndorfer was required to spend 50% of the work week traveling throughout New York City. (R. 225, 1354.) To get to appointments, Zurndorfer was frequently required to walk several blocks and navigate the stairs of the New York City subway system, often while carrying presentation materials or a laptop. (R. 225, 1200, 1343.)

## III. Plaintiff's Multiple Sclerosis

Multiple sclerosis is a common neurological disorder that affects the central nervous system. MS manifests itself in a variety of symptoms, including weakness in the extremities, a loss of dexterity, gait disturbance, a loss of sensation, nystagmus (involuntary eye movement), foot drop, and fatigue, and may take a number of different courses. 87 Attorneys' Textbook of Medicine (3d. Ed.) ¶¶ 87.00, 87.20–.22. Zurndorfer

3

was diagnosed with primary progressive MS in November 2000 by Dr. Mary Ann Picone, Medical Director of the Bernard W. Gimbel Multiple Sclerosis Comprehensive Care Center ("the Gimbel Center"). (R. 161, 181.) Dr. Lucien Cote had referred Zurndorfer to the Gimbel Center after MRIs of her brain and cervical spine revealed results consistent with MS. (R. 139–42, 1166.) Zurndorfer's late brother had a long and disabling course of MS; he was treated at the Gimbel Center and Zurndorfer continued to do volunteer work at the Center after his death. (R. 137, 946; Pl.'s 56.1 Statement ¶ 5.) For about five years preceding the diagnosis, Zurndorfer had experienced increasing sluggishness and weakness in her left leg. (R. 136.) In 1998, Dr. Picone noticed that Zurndorfer had begun to limp. (R. 946.) Based on the MRI evidence, Zurndorfer's personal and family medical history,[2] and her examination of Zurndorfer, Picone concluded that Zurndorfer had primary progressive MS in November 2000. (R. 181, 944.)

According to the medical evidence in the record, there are at least four basic types of MS: relapsing-remitting, secondary progressive, progressive-relapsing, and primary progressive. (R. 945 (citing Fred D. Lublin & Stephen C. Reingold, *Defining the Clinical Course of Multiple Sclerosis: Results of an International Survey*, 46 Neurology 907, 908–09 (1996) (hereinafter "Lublin & Reingold").) The first three sub-types—relapsing-remitting, secondary progressive, and progressive-relapsing—require a history of one or more remissions or acute relapses. (R. 945, 1169–70); *see also* Lublin & Reingold at 908–09. By contrast, "[t]he essential element in [primary progressive MS] is a gradual nearly continuously worsening baseline with minor fluctuations but no distinct relapses."

---

[2] "About 10% of cases of MS occur in families, usually in siblings." 87 Attorneys' Textbook of Medicine (3d. Ed.) ¶ 87.41.

Lublin & Reingold at 908; (*see also* R. 945 ("Whether steadily progressive or subject to plateaus, a course of disease which includes neither remission nor acute relapse but follows a course of overall progression, is properly characterized as 'primary progressive.'").

## III. Defendant Awards Plaintiff Long-Term Disability Benefits

### A. Initial Review

Unum opened its file on Zurndorfer's life insurance and short and long-term disability claims on September 26, 2002. (R. 1, 9.) By mid-October (R. 1, 19, 158), Unum had received relevant claim forms from Zurndorfer (R. 163–64), CSC (R. 166–70), Dr. Picone (R. 161–62), as well as Zurndorfer's medical records from the Gimbel Center (R. 180–218). On all of the relevant forms, Zurndorfer, her doctor, and her employer wrote that Zurndorfer was unable to work because of her MS, or because of her MS and her shoulder problem. Dr. Picone listed MS as Zurndorfer's primary diagnosis, and a bone spur in Zurndorfer's right shoulder as a "secondary condition contributing to the disability." (R. 161). Dr. Picone identified Zurndorfer's symptoms as "weakness [in] LLE [lower left extremity], fatigue, diminished stamina, pain, balance, foot drop," reported objective findings of "brisk reflexes, nystagmus, clonus, [decreased] sensation, ataxic gait, MRI brain, C[ervical] spine [positive]" and assessed Zurndorfer's restrictions and limitations as "unable to walk long distances; unable to do stairs; cannot lift or carry heavy objects; unable to do any activity requiring balance . . . patient falls frequently [secondary to] foot drop; she must rest at specified intervals; unable to use subways [secondary to] stairs." (R. 161–62.) On the LTD benefits claim form, Zurndorfer wrote

that she was unable to work because of "increasing difficulty walking [and] disabling

fatigue." (R. 163.) On her separate application for disability benefits through the group

life insurance plan, Zurndorfer identified the nature of disability as "MS and calcium

spur-right shoulder." (R. 222.) A CSC human resources administrator wrote that

Zurndorfer had stopped working due to "shoulder surgery and treatment for MS."

(R. 166.)

Unum assigned a nurse in its medical department, Diana Martin, to review

Zurndorfer's file. (R. 19.) On October 18, 2002, Nurse Martin reported:

> Reviewed office notes from 10/2, noting progressive MS, with increased
> gait difficulty, decreased stamina, continued with PT [physical therapy]
> [/]AFO [sic; ankle-foot orthoses] brace. [S]tairs, fatigue major issue[.]
> Exam-CN [central nervous system]—mild nystagmus, to left, increased
> reflexes with clonus, sensation decreased, gait antalgic.
>
> Impression: Based on clinical exam findings in setting of MS, R&Ls
> [restrictions and limitations] of limited walking, standing, sustained
> activities related to fatigue, gait disturbance, drop foot, and continued
> treatment/PT would support impairment an additional 8 weeks, would
> reassess with PT notes and PCP notes, unclear why EE would not be seen
> again by MS specialist for 6 months.[3]

(R. 19.) Nurse Martin's report is accompanied in the file by a notation that says, "FYI,

per RN review completed on 10/18/02, I have extended benefits through 12/13/02." (*Id.*)

The record is unclear as to whether this reflects a decision to extend short-term benefits

or long-term benefits.[4] In any event it is undisputed that on October 29, 2002, after

conducting an internal "roundtable" review, Unum approved plaintiff's long-term

---

[3] Bracketed explanation of abbreviations comes from Plaintiff's Opposition to the Motion for Judgment on
the Record. (Pl.'s Opp. 1-2.)

[4] Plaintiff claimed that it was undisputed that "Unum, on or about October 21, 2002, extended Ms.
Zurndorfer's STD award" ((Pl.'s 56.1 Statement ¶ 35), but defendant disputed the assertion that the cited
page of the Record showed that "Unum extended STD benefits." (Def.'s 56.1 Statement ¶ 35.)

disability claim. (R. 18.) Thereafter Unum Customer Care Specialist Janet Nicholas called plaintiff to tell her that her claim had been approved. (R. 28.)

## B.  Determination of Pre-Existing Condition

On November 6, 2002, Nicholas called Zurndorfer to discuss whether the condition causing her disability was pre-existing as of January 1, 2002, the date that the additional coverage Zurndorfer had purchased became effective. (R. 37.) Nicholas advised Zurndorfer that because she had purchased prescription medication for her MS in the three months before the January 1, 2002 effective date, that the condition causing her disability would be considered pre-existing. (*Id.*) In a November 11, 2002 letter to Zurndorfer,[5] Nicholas formally advised plaintiff that her LTD benefits had been approved, and that Unum would need to investigate further to determine whether her condition was pre-existing. (R. 29.) In the letter, Nicholas explained to Zurndorfer that while Unum was "approving benefits at this time," Zurndorfer could only qualify for "ongoing benefits" if she "continue[d] to meet the definition of disability in [the] contract."[6] (*Id.*) Nicholas also included information about GENEX, a wholly-owned subsidiary of UnumProvident that could assist Zurndorfer in obtaining Social Security Disability ("SSDI") benefits. (R. 30–31.)

On January 20, 2003 a Unum physician, Dr. Lani Graham, reviewed plaintiff's medical file and observed that Zurndorfer had seen Dr. Picone for treatment of her MS in

---

[5] As with all of the letters written by Nicholas to Zurndorfer, the November 11, 2002 letter was written on Unum letterhead marked with the UnumProvident seal, and identified Nicholas only as a "Customer Care Specialist." (*See*, e.g., R. 37, 66, 73, 76, 88, 100.)

[6] On December 9, 2002, Nicholas reported that she had told another Unum employee that Unum had "accepted [Zurndorfer's] claim to her next doctor's appointment in April 2003." (R. 54.)

the three months before the January 1, 2002 effective date for her upgraded policy.[7]

(R. 62.) As Zurndorfer's claim had MS as its primary diagnosis,[8] Nicholas explained in a

January 28, 2003 letter that her MS was a pre-existing condition at the time of the policy

upgrade, and therefore Zurndorfer was entitled to a 50% benefits rate rather than a

66.666% rate.[9] (R. 66–68.) On January 30, 2003, Nicholas called Zurndorfer to advise

her that her "medical condition (MS) is a pre-existing condition." (R. 72.) Nicholas

learned from Zurndorfer that her next doctor's appointment (with Dr. Picone) would be

on March 13, 2003; Nicholas explained that "[i]n the very near future we will be

requesting updated medical information." (R. 72.)

## IV. SSDI Benefits

In November 2002, plaintiff told Nicholas that she would accept the assistance of

Unum's affiliate, GENEX, in applying for Social Security Disability Insurance ("SSDI")

benefits from the Social Security Administration ("SSA"). (R. 44.) Nicholas made a

prompt request to GENEX, (R. 44), and on November 22, 2002, GENEX informed

Nicholas that it would accept Zurndorfer's SSDI case.[10] (R. 338.) Zurndorfer and

---

[7] At the time of Dr.Graham's review, Unum had received medical records kept by Dr. Lucien Cote, (who had referred Zurndorfer to Dr. Picone) by Dr. Pascal and by Recovery Physical Therapy (R.328–35 (Dr. Cote's records), 342–84 (Dr. Pascal's records), 385–415 (Recovery Physical Therapy's records); *see also* R. 1 (noting that records from Dr. Cote were received November 26, 2002, that records from Recovery Physical Therapy records were received December 9, 2002, and providing no separate entry for the records from Dr. Pascal which directly precede the records from Recovery Physical Therapy).)

[8] Indeed, Dr. Graham's report listed MS as the only "condition[ ]for which claimant is filing disability benefits." (R.62.)

[9] The letter advised Zurndorfer that she could submit a written appeal addressed to "UnumProvident." (R.67.)

[10] GENEX also explained that during their initial contact with Zurndorfer, they would be addressing "in detail" her responsibility to re-pay any overpayment to Unum, and promised to update Nicholas regularly as to the status of the claim. (R. 338.)

8

GENEX's joint efforts bore fruit in April 2003 when plaintiff was found to be totally disabled and entitled to disability payments. (R. 854.) That is, the SSA determined that Zurndorfer was unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). As required under the policy, the SSDI benefits were offset against the LTD benefits then being made by Unum. (R. 863.)

## V.    Defendant Terminates Plaintiff's Long-Term Disability Benefits

On February 27, 2003, Nicholas followed up with Zurndorfer in a letter seeking an "updated certification of [her] continued disability." (R. 73.) Specifically, Nicholas asked Zurndorfer to have her "attending physician" complete certain forms and to provide updated medical records "from January 1, 2003 to the present." (*Id.*) By the end of March, Zurndorfer and Dr. Picone had returned the forms and provided the updated medical records. (R. 1, 74, 841–47.) Dr. Picone reported that as of March 13, 2003 plaintiff had progressive MS with a "guarded" prognosis, that her symptoms included weakness and fatigue, that she had difficulty walking, that she could not walk long distances and that she fell occasionally. Dr. Picone did not believe a return to work was appropriate. (R. 843, 845.)

On April 29, 2003, Nicholas sought a medical referral from Nurse Janice Albert and Dr. Daniel Krell. (R. 80–82.) In the referral, Nicholas characterized plaintiff's medical and occupational situation as follows:

> 56 year old sale[s] account manager dx with MS. [I]nsured
> became disabled 8/16/02 due to increased fatigue, walking

9

> difficulties, stiffness in left leg, pain. Her occupation
> requires her to travel with walking and standing. Her
> occupation cannot be performed sedentary. [I]nsured also
> had bone spur surgery to right shoulder in 08/02.

(R. 80.) Nurse Albert was critical of Dr. Picone's diagnosis, noting that the "MRI

findings [were] not consistent with the McDonald's criteria [for diagnosing MS]" and

that there had been no change in plaintiff's MRI readings between 2000 and 2003. Nurse

Albert also noted that Zurndorfer's oncologist, Dr. Pascal, had concluded that her MS

stabilized while being treated with mitoxantrone, and further that plaintiff had worked up

to the time of her shoulder surgery. (R. 82.) According to Albert, it was "unclear what

had changed at the DOD [date of disability] in respect of her complaints relating to her

complaints to her MS diagnosis." (*Id.*) Dr. Krell offered the same opinion, noting that

plaintiff's "difficulties with her left leg (foot drop, dragging) were identified prior to

DOD" and that there was no documentation of a worsening of plaintiff's MS at the time

of the DOD. (*Id.*) Dr. Krell also based his conclusion on Dr. Pascal's assessments in

June and October of 2002 of Zurndorfer "ECOG performance status [at] 0-1." (*Id.*) Dr.

Krell explained that these assessments indicated that Zurndorfer was "[r]estricted in

physically strenuous activity, but ambulatory and able to carry out work of a light or

sedentary nature (e.g. light housework, office work)." (*Id.*) Dr. Krell did not address

Nicholas's determination in the medical referral that Zurndorfer's "occupation required

her to travel with walking and standing" and it therefore "[could] not be performed

sedentary." (R. 80.)

On May 22, 2003 Nicholas noted her intention to terminate benefits: "Based on

medical departments [sic] review of file, there have been no changes in the insured's

medical status since onset of disability." (R. 92.) Nicholas notified Zurndorfer and CSC

10

of her decision by phone and by mail. (R. 88, 95, 98, 100.) In the May 23, 2003 letter to Zurndorfer, Nicholas summarized the physical requirements of Zurndorfer's regular occupation: "lifting up to 20 pounds," "frequent reaching, handling and near acuity," and the possibility of "frequent travel." (R. 88–89.) Nicholas noted that Dr. Picone listed Zurndorfer's restrictions and limitations as, "cannot walk long distances, unable to do stairs, trips and falls occasionally." (R. 89.) However, Nicholas explained that the medical information in the file "d[id] not support the reported level of impairment," as Zurndorfer had worked up to the date of the shoulder surgery and it was "unclear what changed at the time [she] stopped working in respect to [her] diagnosis of multiple sclerosis." (*Id.*) Nicholas also noted, as had Nurse Albert and Dr. Krell, that Dr. Pascal concluded that her "progressive multiple sclerosis [was] in remission from mitoxantrone. (*Id.*)

When Nicholas spoke with Kathy Crowley at Zurndorfer's former employer, CSC, Crowley expressed her surprise at the decision, especially given that GENEX had helped Zurndorfer successfully acquire SSDI benefits. (R. 96.) When Zurndorfer asked why the decision terminating benefits had not been made sooner, Nicholas "confirmed that we had this information at onset but it was not properly reviewed. . . . [I]t was brought to the claims dept. attention that based on medical records there appeared to be no change in her medical condition." (*Id.*)

Through counsel, Zurndorfer requested review of the May 23, 2003 determination. (R. 864.) Attached to the request were letters from Dr. Picone and Dr. Pascal, both dated June 5, 2003. (R. 867–69.) Both doctors confirmed that

11

Zurndorfer had progressive MS[11] and that she was, as of the writing of their letters, disabled. (*Id.*) Regarding Dr. Pascal's notation that Zurndorfer had stabilized while receiving chemotherapy, Dr. Picone noted that Dr. Pascal was not an MS specialist, but a hematologist and oncologist, and that Pascal "does not and will not provide an assessment of the patient's multiple sclerosis course." (R. 867.)

In any event, as of the writing of the letter in June 2003, Picone observed that Zurndorfer's condition had deteriorated further. Her gait had worsened, her stamina continued to be a problem, and she fell frequently. (R. 868.) She was now wearing an ankle-foot orthosis. (*Id.*) Dr. Pascal restated his observation that Zurndorfer's progressive MS had stabilized while undergoing chemotherapy but noted that treatment had stopped more than eight months prior and that her MS was worsening as indicated by Dr. Picone. (R. 869.)

Christopher Leddy, a Senior Appeals Specialist for Unum, referred Zurndorfer's appeal to Nurse Susan Grover and Dr. Allen Neuren, to determine whether the MS "diagnosis [was] supported as of 5/23/03." (R. 923.) Leddy noted that Zurndorfer "is having difficulty with her left leg with foot drop, and weakness to the point that she trips frequently, once on the way into a treatment where knee bruising is documented." (*Id.*) After summarizing the medical information in Zurndorfer's file, Nurse Grover concluded that the medical data in the file was "not conclusive" of a diagnosis of MS because Zurndorfer's MRI's did not show new lesions, and because MS usually occurs in younger persons. (R. 139.) Notwithstanding that Zurndorfer, her doctor, her employer and a

---

[11] The treatment notes of both Dr. Picone and Dr. Pascal consistently indicate a diagnosis of progressive MS. (*See, e.g.,* R. 371 (recording Dr. Pascal's impression of Zurndorfer's condition at her final office visit on October 2, 2002, as "Progressive Multiple Sclerosis responding to treatment"); R. 461, 466 (Dr. Picone's diagnosis that Zurndorfer suffered from primary progressive MS).

12

number of Unum employees had all agreed that Zurndorfer had stopped working because of her MS with her shoulder as a secondary condition, Grover stated that Zurndorfer went out of work August 16, 2002, "due to her right shoulder surgery, not her claimed condition of MS." (*Id.*) Without addressing the reports of Zurndorfer's falling, Grover offered that Zurndorfer's problems with left leg weakness and left foot drop dated to November 2000, that Dr. Pascal reported her condition "stable" at the time of DOD, and that there was "no documentation of a worsening of insured's MS at the DOD." (*Id.*) Dr. Neuren offered the same analysis, concluding that there was a failure to demonstrate findings of progressive MS, that Dr. Pascal found her condition had stabilized in the Fall of 2002 and that "[t]here is nothing in the record to suggest the insured's condition had worsened at the time of her shoulder surgery." (R. 1331.) Neither Grover nor Neuren addressed the issue of whether Zurndorfer's MS worsened after she stopped chemotherapy in October 2002, as reported by Dr. Picone. Nor did they consider whether her foot drag and falling before the DOD, even if stabilized during chemotherapy, were sufficient to render her disabled.

Senior Appeal Specialist Leddy adopted Grover and Neuren's reports and denied Zurndorfer's appeal in a letter dated August 11, 2003. Reversing his earlier understanding that Zurndorfer "had stopped working 8/16/02 [due to] complications of MS" (R. 1323), Leddy adopted Nurse Grover's conclusion that Zurndorfer's last day of work "was more related to her scheduled shoulder surgery than her MS diagnosis" (R. 107). While acknowledging that Dr. Picone advised Zurndorfer to stop working on account of the increased stress of the surgery and her underlying problems with MS, Leddy found that the record did not "substantiate a worsening of [Zurndorfer's] MS

13

diagnosis" as of August 16, 2002. (*Id.*) Reciting Grover and Neuren's analysis of the unchanging MRI results, the absence of a spinal fluid study (a "CSF" test), Zurndorfer's age at the time of the initial MRI, and the observations of Dr. Pascal that Zurndorfer's MS was stable, Leddy determined that the "medical records [did] not conclusively support the MS diagnosis itself," and that they "argue against the presence of a progressive disease." (R. 108.) In sum, Leddy wrote that "[n]one of the documentation reveals a substantial change in her condition as August 16, 2002 that would explain her sudden inability to perform her occupational duties." (*Id.*) Leddy reaffirmed his decision in a letter dated November 7, 2003. (R. 112–13.)

On November 18, 2003, Zurndorfer's counsel provided Leddy a supplemental submission by Dr. Picone that further addressed (1) the diagnosis of primary progressive MS and (2) her symptoms on and after her DOD in the Fall of 2002. First, Dr. Picone explained that while MRI results showing lesions on the brain might reflect damage caused by aging (as noted by Dr. Neuren), MRI results showing lesions on the cervical spine, as in Zurndorfer's case, never appear as an artifact of aging and, if consistent with the results of a patient's history and a neurological examination, compel the diagnosis of MS. (R. 944.) Second, Dr. Picone noted that primary progressive MS may be steadily progressive or, as in Zurndorfer's case, have "plateau periods and temporary minor improvements" yet remain progressive overall. (R. 945.) Moreover, Dr. Picone explained that Zurndorfer had spent considerable time at the Gimbel Center even before her 2000 diagnosis, and that Picone had noticed first-hand the deterioration in Zurndorfer's ambulation over the course of several years. (R. 946.) While disagreeing with Dr. Pascal's observation of stabilization during chemotherapy, Picone noted that

14

such a plateau was not inconsistent with the primary progressive nature of Zurndorfer's disease. Indeed, by November 2003, Zurndorfer was using both a cane and an ankle-foot orthosis, was falling frequently and was at great risk of injury due to trauma. (*Id.*) Dr. Picone concluded that Zurndorfer was by November 2003 a "6" on the Expanded Disability Status Scale, indicating that Zurndorfer was ambulatory with unilateral assistance to a distance of 100 meters, or "one step short of being wheelchair dependent." (*Id.*)

Both Dr. Picone and Zurndorfer's counsel requested the opportunity for Dr. Picone to speak directly to Dr. Neuren about Zurndorfer's diagnosis and prognosis, and if there were any doubt, to arrange for her to be examined by an independent neurologist with expertise in MS. (R. 943, 947.) Dr. Neuren declined to speak with Dr. Picone and there is no evidence that Unum ever agreed to an examination by an independent expert. Dr. Neuren did review Dr. Picone's submission but concluded that it "failed to clarify the situation." (R. 1159.) He questioned the diagnosis of progressive MS without a CSF test and again pointed to Dr. Pascal's observation that Zurndorfer's MS had stabilized during her chemotherapy treatment which, as noted, ended on October 2, 2002. (*Id.*) Dr. Neuren noted that Dr. Picone's examinations referenced increasing walking difficulties and increased fatigue but complained that on August 5, 2002, there had been no "actual examination," "no mention of frequent or increased falling" and "no indication that the insured needed an assistance device to ambulate." (R. 1159.) Of course, as Dr. Neuren acknowledged in the same report (R. 1158), the notes of Zurndorfer's October 2, 2002 examination at the Gimbel Center in fact set forth results of

15

a neurological examination made at that time and also reported Zurndorfer's frequent falling (R. 189–90).

On January 23, 2004, Jeanne Flaherty, a Lead Appeals Specialist, wrote to Zurndorfer's counsel to inform him that, based on Dr. Neuren's review, Unum was upholding its determination to terminate Zurndorfer's LTD benefits. (R. 115–18.) Flaherty, however, invited counsel to submit additional information regarding Zurndorfer's "functional capacity as the date benefits ended on 5/23/03 and ongoing." (R. 117.) In response, Zurndorfer's counsel submitted a supplemental letter from Dr. Picone explaining that a CSF test requiring a painful lumbar puncture was not required to reach a definitive diagnosis of progressive MS given the presence of spinal cord lesions on Zurndorfer's MRI as well as Picone's clinical observations. (R. 1166–67.) Responding to Dr. Neuren's criticism that there was no comprehensive evaluation of Zurndorfer's condition at the date of disability, Picone pointed to her own examination notes of August 8, 2002 as well as the "careful neurological examination" conducted by her colleague, Dr. Said Shanawani, at the time of Zurndorfer's October 2, 2002 checkup. (*Id.*) Counsel also submitted a letter dated January 24, 2004 from Jennifer Kenton, Zurndorfer's direct supervisor at CSC. Kenton reported that Zurndorfer's performance had substantially deteriorated by the summer of 2002. (R. 1215–16.) Zurndorfer, who was expected to make fifteen in-person sales calls per week, was making fewer sales calls per week, and by the end of the summer, could only make one visit per day. (*Id.*) Kenton explained that in early 2001 she observed that Zurndorfer regularly had skinned knees and visible bruises. (R. 1215.) Later, in the Spring of 2002, Kenton noticed that, despite her best efforts to hide it, Zurndorfer was visibly dragging her leg. (*Id.*)

Zurndorfer's colleagues advised Kenton that Zurndorfer was struggling to complete her work, as she was unable to carry her laptop and briefcase or use the stairs on the subway, both of which Kenton considered to be critical aspects of Zurndorfer's job. (*Id.*) Zurndorfer's declining performance and health prompted Kenton to consider an uncomfortable confrontation. (R. 1216.) Kenton recalled that before she took that step, Zurndorfer came to her and explained that she had MS and would be unable to continue working. (*Id.*)

Counsel also provided a statement from one of Zurndorfer's colleagues at CSC, David Nickelsen (R. 1196), a letter from Zurndorfer describing her condition and her job duties (R. 1199–1200, 1203), Zurndorfer's progress notes from the Gimbel Center dating from March 2003 (1185–91), updates from her physical therapist to Dr. Picone (R. 1192– 95), and records from the physical therapist (R. 1201–02.) Nickelsen explained that his position often required him to accompany Zurndorfer on client visits and that he noticed a decline in her activity, both in terms of the number of visits she was making and in her mobility and energy level. (R. 1196.) He reported that in the months preceding Zurndorfer's last day of work she was unable to walk short distances, seeking to take a cab for trips as short as four blocks. (*Id.*) Nickelsen felt compelled to take Zurndorfer's arm as they walked. (*Id.*) Once, just before Zurndorfer left work, Nickelsen left her near the front door of a client's building while he went to hail a cab for the ten-block ride back to the office. (*Id.*) Without Nickelsen to support her, Zurndorfer fell flat on her back. (*Id.*) Still, for a time at least, Zurndorfer attempted to "brush off the incident" and continue to work. (*Id.*)

In her letter, Zurndorfer described her progressive inability to do her job.

(R. 1199–1200, 1203.) Zurndorfer explained that as an Account Manager for CSC she was required to have a total of fifteen face-to-face meetings each week with her clients, forty-five major corporate law firms in midtown and lower Manhattan. (R. 1200.) To accomplish this, Zurndorfer, was required to travel across the city by subway and on foot. (*Id.*) Using the subway, Zurndorfer reported, meant taking the stairs, given the scarcity of elevators. (*Id.*) Even walking posed a problem. Zurndorfer recalled that she "fell frequently: in the office, in the lobby of law firms, and on the street." (*Id.*) She experienced increasing shoulder pain that prevented her from carrying presentation materials and her laptop. (*Id.*) In sum, she explained that she "struggled through each day until things just got too hard." (*Id.*)

Medical records from the Gimbel Center included additional standardized assessments of Zurndorfer's capacity as measured at visits on March 27, 2003, and December 2, 2003. (R. 1185–86, 1189.) The March 27, 2003 notes show that Zurndorfer reported that she was only able to walk eight blocks with difficulty and that she had been prescribed an ankle-foot orthosis to aid her walking. (R. 1186.) An office note for June 5, 2003 reported that Zurndorfer "continued to have increased difficulty with walking" and that she had "obtained the AFO [ankle foot orthosis]." (R. 1187.) At the December 2003 appointment, Dr. Picone noted increased spasticity on Zurndorfer's left side and that her gait had progressively worsened. (R. 1189.) The tips of her left shoe were worn out. (*Id.*) Picone also noted that Zurndorfer's ankle-foot orthosis was painful to wear.

The supplemental information submitted in January 2004 was reviewed by Dr. Neuren in early February. (R. 1341.) Interestingly, Dr. Neuren no longer took issue

18

with Dr. Picone's diagnosis of primary progressive MS. Instead, he concluded that the Gimbel Center examination of March 27, 2003 did not show "significant progression" of her disease because her ambulatory rating (0-1) and stair rating (2) were the same as her scores in 2001. (*Id.*) He noted that as of March 2003, Zurndorfer could only walk 8 blocks with difficulty and was now wearing an ankle-foot brace but apparently did not consider these developments to be a sign of deterioration. There is no evidence that he actually discredited the first-hand observations or Zurndorfer's co-workers that she was falling in the street and was unable to make in-person sales calls. Nor did he discredit Zurndorfer's statement that she could not walk the distances and climb the stairs required by her job and that she was falling frequently. At the same time, however, there is no indication that he gave any weight to these statements in his analysis.

In a letter dated March 1, 2004, Unum's Flaherty wrote to Zurndorfer's counsel to advise that the denial of benefits had been upheld. As had Dr. Neuren, Flaherty now downplayed the issue of plaintiff's proper diagnosis, stating that Unum's deterioration was "not based on what her confirmed diagnosis is . . . ." (R. 1311.) Instead, the decision was based on the syllogism that Zurndorfer had "demonstrated the ability to perform her job" prior to August 2002, that the medical records did not demonstrate a "significant worsening" of her MS symptoms, and, therefore, that there was "insufficient information" to conclude plaintiff was disabled from returning to work. (*Id.*) Flaherty did note that Dr. Picone's office notes from December 3, 2003 stated that Zurndorfer's gait had progressively worsened but she discounted this assessment as it was made six months after plaintiff's benefits were terminated. Flaherty took no note of the statements and observations of Zurndorfer's co-workers and explicitly limited her review to

plaintiff's "medical records." (R. 1312.) Flaherty did acknowledge that Zurndorfer indicated difficulty with subway travel and building access but, contrary to Nicholas's earlier conclusion that plaintiff's occupation "[could] not be performed sedentary," (R. 80), Flaherty concluded that this would not render her disabled under the terms of the policy. In closing, Flaherty advised Zurndorfer's counsel that the appeal process was concluded and no further review was available. This litigation followed.

## DISCUSSION

### I.   Legal Standard

The first question before the Court is how to treat defendant's motion for judgment on the administrative record.  District courts in this circuit have split on how to treat a motion for judgment on the administrative record when, as here, a motion for summary judgment has not yet been decided.  *See, e.g.*, *Slupinski v. First Unum Life Ins. Co.*, No. 99 Civ. 0616 (TPG), 2005 U.S. Dist. Lexis 21601, at *15–*16 (S.D.N.Y., Sept. 27, 2005) (collecting cases and deciding motions as bench trial on the papers).  Since a motion for judgment on the administrative record is not contemplated by the Federal Rules of Civil Procedure, some courts treat such motions as motions for summary judgment under Rule 56, while others decide them under Rule 52(a) of the Federal Rules of Civil Procedure as bench trials "on the papers."  *See id.*  The Second Circuit has held that the latter approach is "entirely proper" in certain circumstances.  *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003).  In *Muller*, the court held that a bench trial on the papers had been appropriate because the district court had already denied a motion for summary judgment, and no additional discovery had taken place.  *See id.*  In a recent unreported case, the Second Circuit treated an appeal from a decision granting the defendant insurer's motion for judgment on the administrative record as an appeal from a grant of summary judgment where the plaintiff-appellant contended that the district court should have reviewed the administrator's decision *de novo*.  *See Flannagan v. First Unum Life Ins.*, 170 Fed. Appx. 182, 184 (2d Cir. 2006).  As no motion for summary judgment has yet been decided and there is a threshold factual

dispute as to whether the administrator's benefits determination is entitled to deference, the Court treats defendant's motion as one seeking summary judgment.

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a dispute over a material fact is "genuine" depends on whether the evidence is of a type that would permit a reasonable finder of fact to return a verdict in favor of that party. *Id.*; *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).

The parties agree that this action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). A district court reviews a denial of benefits under ERISA "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 123–24 (2d Cir. 2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the plan grants discretion to the administrator, the district court reviews the administrator's decision under the arbitrary and capricious standard. *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) ("[W]here the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious.") (internal quotations omitted). The parties agree that the plan in this

case gave Unum America discretionary authority to determine Zumdorfer's eligibility for benefits. What is in dispute is whether Unum America or its parent UnumProvident made the decision to terminate benefits.

"Where an unauthorized party makes the determination, a denial of plan benefits is reviewed under the de novo standard." *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 229 (2d Cir. 1995). Whether the proper administrator made the benefit determination is a question of fact for the district court on which the administrator bears the burden of proof. *See id.* at 230. Unum America attempts to meet this burden by pointing out that all of the letters communicating claims decisions were written on Unum America letterhead, and that Flaherty's March 1, 2004 letter identified Flaherty as a Unum America representative. Plaintiff contends that this showing is not enough, particularly in light of evidence showing, for instance, that Nicholas was usually, though not always, identified as representing UnumProvident (and not Unum America), or that appeals were directed to be sent to UnumProvident. However, even construed in the light most favorable to plaintiff, the evidence in the records suggests, at most, that Nicholas was a UnumProvident employee, and that Flaherty and Leddy sometimes worked on UnumProvident's behalf. What plaintiff cannot show, nor does she even assert, is that Nicholas, Leddy and Flaherty were not authorized by Unum America to make claims decisions on Unum America's behalf.

Therefore, the question for the Court is whether a corporation named as a fiduciary in a disability plan governed by ERISA may discharge its duties through the actions of authorized agents who are employed by or otherwise affiliated with the fiduciary's parent corporation. Although plaintiff cites a number of cases which suggest

23

that *de novo* review might arguably be required in such situations, *see, e.g., Daniel v. UnumProvident Corp.*, No. 04 Civ. 1073, at 21, (E.D.N.Y. Mar. 13, 2006) (unreported case cited to by both parties) ("Therefore, if UnumProvident, rather than Unum Life, determined plaintiff's claim, plaintiff would arguably be entitled to *de novo* review.) *Burchill v. Unum Life Ins. Co. of Am.*, 327 F.Supp. 2d 41, 53 (D. Me. 2004) (same); *Johnson v. Unum Life Ins. Co. of Am.*, 329 F.Supp. 2d 161, 171 (D. Me. 2004) (same), the only factually similar cases in which courts actually applied the *de novo* standard are clearly distinguishable. Where courts have employed *de novo* review, they have relied on evidence that showed that those who made claims decisions were not acting as authorized agents of the fiduciary. For instance, in *Anderson v. Unum Life Ins. Co. of Am.*, 414 F.Supp. 2d 1079, 1087 (M.D. Ala. 2006), upon which plaintiff principally relies, the court was presented with a General Services Agreement between Unum America and UnumProvident that specified that UnumProvident would, acting as an independent contractor, make all claims decisions, and that UnumProvident would have exclusive discretion and control over its employees' claims practices. *See also Davidson v. Liberty Mutual Ins. Co.*, 998 F. Supp. 1, 8–9 & n. 11 (D.Me. 1998) (finding that fiduciary had improperly delegated decision-making to a subsidiary where the parties stipulated that the decision-maker, though an employee of the fiduciary, worked solely for the subsidiary). As the record indicated that this agreement had been followed and that UnumProvident employees had denied Anderson's claim for benefits and affirmed that decision on appeal, the *Anderson* court held that UnumProvident, and not Unum America, had made the relevant claims decision. *Anderson*, 414 F. Supp. 2d at 1098–99. In *Boyles v. Unum Life Ins. Co. of Am.*, No. 05 Civ. 6015, 2006 U.S. Dist. Lexis 88581, at *14–*15 (C.D.

24

Cal. Nov. 20, 2006), the court, in light of *Anderson*, ordered Unum to disclose the General Services Agreement, or stipulate to *de novo* review; Unum chose *de novo* review.[12]

As a corporation, Unum America can only act through its agents, and there is no indication that Nicholas, Leddy and Flaherty were not acting as Unum America's agents when they made decisions related to plaintiff's claims. *See Braswell v. United States*, 487 U.S. 99, 110 (1988) ("Artificial entities such as corporations may act only through their agents . . . .") The Court is unaware of any authority which requires a corporation acting as an ERISA fiduciary to limit its choice of agents to carry out its obligations absent a controlling contractual obligation. *Sharkey v. Ultramar Energy Ltd. supra* and *Rubio v. Chock Full O'Nuts Corp.*, 254 F. Supp. 2d 413 (S.D.N.Y. 2003), are not to the contrary. In *Sharkey*, the Second Circuit remanded to the district court to decide who made the challenged benefit determination where plaintiff had presented evidence that the named fiduciary, a pension committee, had not actually made the benefit determination. 70 F.3d at 229–30. In *Rubio* the court reviewed a benefits determination *de novo* where the named fiduciary, an employee benefits committee, had delegated final decision-making authority to a different committee. 254 F. Supp. 2d at 423–25. The court in *Rubio* found that the fact that the non-fiduciary committee in *Rubio* represented to the claimants that the fiduciary committee had made the decision "reinforce[ed] the flaw" of the improper delegation. *Id.* at 424 (citing *Doe v. Traveler's Ins. Co.*, 971 F. Supp. 623 (D. Mass. 1997) (finding that non-fiduciary's use of fiduciary's letterhead for claims letter was deceptive). The failure of the relevant pension and benefit

---

[12] There is no evidence in the record to suggest that the General Services Agreement referred to in *Boyles* and *Anderson* governed the claims decisions in this case.

committees in *Sharkey* and *Rubio* to make the challenged determinations defeated the expectations of parties that granted those committees discretionary authority because those committees were expected to act for themselves. Here, the parties contracted for Unum America to make the benefit determinations, and it is beyond dispute that authorized agents of Unum America, whatever their other roles within UnumProvident structure acted as claims administrators. *See Sidou v. UnumProvident Corp.*, 245 F. Supp. 2d 207, 219 (D. Me. 2003) (holding that *de novo* review was not warranted where record showed only that final decision-maker was a claims representative for both the fiduciary and a related entity). Moreover, there is no competent evidence before the Court to suggest that the contractual provision granting UnumAmerica discretionary authority precluded Unum America from acting through agents that were employed by its parent.

A court applying the arbitrary and capricious standard of review may overturn a decision to deny or terminate benefits only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX*, 52 F.3d 438, 442 (2d Cir. 1995) (internal quotations omitted); *see also Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The question before a reviewing court under [the arbitrary and capricious] standard is whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (internal quotations omitted). Substantial evidence is "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotations

26

omitted) (alternations in original). Still, as plaintiff rightly points out, "deferential review is not no review, and deference need not be abject." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (internal quotations omitted).

## II.    Application

The Court finds that defendant's decision to terminate benefits fails to pass muster even under this highly deferential standard. In defense of its claims decisions, defendant offers three arguments. First, Unum questions whether Zurndorfer really has MS and, in any event, contends that she failed to show that she had a progressive form of the disease. Second, Unum argues that Zurndorfer was able to perform her job before she stopped work to undergo shoulder surgery in August 2002, that her MS (if she had it) stabilized during this period while in the care of her oncologist, Dr. Pascal, and that once she recovered from arthroscopic surgery she was able to return to work. Finally, Unum contends that even if Zurndorfer could not perform the walking and stair climbing to do her job in Manhattan, these duties were not required for her "regular occupation" in the general economy and, therefore, did not qualify her for long-term disability. Defendant's first and third arguments are specious. Its second argument is based both on faulty logic and the myopic consideration of a doctor's report that was clearly stale at the time Unum terminated plaintiff's benefits in May 2003. Each argument will be discussed in turn.

**A.    Unum's Refusal To Accept Zurndorfer's Medical Diagnosis Of Progressive MS Was Arbitrary**

The administrative record clearly indicates that Unum's decision to terminate plaintiff's benefits rested in substantial part on their conclusion that Zurndorfer had failed to prove that she had MS or that it was progressive in form. Nevertheless, Unum's conclusions regarding whether plaintiff had demonstrated that she had progressive MS are hard to pin down. At times, Unum has contended that Zurndorfer does not have MS at all. In August 2003 Nurse Grover concluded that the medical records were "not conclusive" of a diagnosis of MS (R. 1329); Unum representative Christopher Leddy determined that as of November 2003 the "clinical data fails to conclusively establish the diagnosis of MS itself," (R. 112); and in January 2004, Dr. Neuren felt that the diagnosis of MS was not adequate under the McDonald criteria in the absence of a CSF test. (R. 1159.) The same theme is sounded in Unum's moving papers, which are peppered with references to plaintiff's "claimed medical condition" or to "her MS, if that is what she has . . ." (Def.'s Mem. 2; Def.'s Reply 1.)

At other times, Unum has argued that Zurndorfer had not demonstrated that her MS was "progressive" in its course.[13] In Unum's final claims letter denying Zurndorfer's

---

[13] It should be noted that Unum has sometimes advanced a third position in the alternative: that Zurndorfer's diagnosis is effectively beside the point. In the final claims letter, Jeanne Flaherty explained the Unum's "determination of ongoing liability is not based on what [Zurndorfer's] confirmed diagnosis is . . ." (R. 1311.) At argument, Unum's counsel offered that he did not "think that Unum fairly reached a definitive conclusion [as to whether Zurndorfer had primary progressive MS], nor does it have to . . . ." (Tr. 27.) While it is true that a particular diagnosis need not determine whether a claimant is entitled to benefits, Unum conceded in its brief that the "administrator . . . appears to have been prepared to accept that [CSF testing] as not only establishing the diagnosis, but also, as sufficient corroboration for the disability claimed." (*Id.*)

claim, Flaherty explained that while "Dr. Picone maintains that Ms. Zurndorfer's diagnosis is primary progressive MS . . . Dr. Neuren has stated that the medical records still do not demonstrate any significant progression of her disease." (R. 1311.) Likewise, Unum argues in its papers that it "pressed plaintiff to provide the results of CSF testing . . . as that CSF testing would definitively establish whether plaintiff had progressive MS." (Def.'s Reply 5 n.9.)

Unum's position that Zurndorfer has not demonstrated that she suffers from MS is without merit. The evidence in the record overwhelmingly supports the conclusion that Zurndorfer has MS. That is the opinion of the physicians who examined her including her treating physician, other physicians at the MS center where Zurndorfer was a patient, and her oncologist who prescribed chemotherapy because she had MS. Of course, it was also the conclusion reached by Unum itself when defendant decided she was qualified for long-term disability in November 2002. (R. 34 ("Insured has MS reasonable to be disabled until next doctor's appointment 04/03.").) Against this backdrop, contrary determinations like that of Unum's Senior Appeals Specialist Christopher Leddy finding that Zurndorfer's medical records "do not conclusively support the MS diagnosis itself" (R. 108) hardly reveal an unbiased evaluation of plaintiff's condition. There is no serious question but that Zurndorfer suffers from MS as Unum's counsel ultimately (and properly) conceded during oral argument. (Tr. 22.)

While now conceding that plaintiff has MS, Unum continues to argue that she failed to show that she was properly diagnosed with progressive MS. Unum repeatedly criticizes Zurndorfer's treating physician, Dr. Picone, for failing to undertake an invasive spinal fluid (CSF) examination to confirm this diagnosis. (Def.'s Reply 5 n. 9, 6, 10 n.

29

18; Tr. 32.) As noted, the evidence in the record indicates that there are four recognized subtypes of MS. (R. 945.) Three are progressive (primary progressive, secondary progressive, and progressive-relapsing) and one is not (relapsing-remitting). *See* Lublin & Reingold at 908–09. Since Unum agrees that Zurndorfer has MS, the only question is what type she has. By arguing that plaintiff's doctors did not establish to Unum's satisfaction that she had a progressive disease, Unum implicitly but necessarily contends that plaintiff had relapsing-remitting MS. Relapsing-remitting MS is clearly defined by acute attacks followed by complete or partial remission. (R. 945, 1169–70); *see also* Lublin & Reingold at 908–09. There is not a scintilla of evidence in the record that Zurndorfer's MS presented itself through acute attacks followed by remissions. *A fortiori* she suffered from a progressive subtype of disease and Unum's criticism that Zurndorfer did not undergo a spinal tap provides no rational basis for concluding otherwise.[14] Moreover, two of the progressive subtypes, secondary progressive and progressive-relapsing are diagnosed, as is relapsing-remitting MS, based on a history of clear acute

---

[14] The stated basis for Unum's insistence on the spinal tap is that the 2001 McDonald criteria required an abnormal CSF testing for a secure diagnosis of primary progressive MS. (R. 82, 116, 1159.) There is no dispute that the 2001 McDonald criteria do recommend such a finding of CSF abnormality. (R. 944); Ian McDonald et al., *Recommended Diagnostic Criteria for Multiple Sclerosis: Guidelines from the International Panel on the Diagnosis of Multiple Sclerosis*, 50 Annals of Neurology 121 (2001). However, contrary to the apparent position of counsel and of Unum's claims administrators, there is nothing in the record to suggest that CSF testing is required, or even useful for differentiating between sub-types of MS. Rather, the McDonald criteria are used to classify an individual "as having MS or as not having MS." McDonald et al., *Recommended Diagnostic Criteria for Multiples Sclerosis supra* at 122. Where a patient presents with "an insidious neurological progression suggestive of multiple sclerosis," *id.* at 125, abnormal CSF results are needed, as Dr. Neuren and Unum noted, "to make a secure diagnosis of MS." (R. 116, 1159 (quoting McDonald et al., *Recommended Diagnostic Criteria for Multiple Sclerosis, supra* at 125).) As Unum has conceded that Zurndorfer has demonstrated that she has MS, the absence of confirmatory CSF testing cannot constitute substantial evidence in support of a determination that Zurndorfer did not show that she he has primary progressive MS.

30

attacks. (R. 1176.) Thus, according to the evidence in the record, it would appear that primary progressive MS is the only reasonable categorization of Zurndorfer's disease. As noted primary progressive MS is characterized by progression of disability from onset without acute attacks but with a steady decline with or without occasional plateaus or temporary minor improvements. (R. 945, 1169–70, 1176); *see also* Lublin & Reingold at 908. Not surprisingly, Zurndorfer's clinical record shows just such a decline, beginning with a barely noticeable limp in 1999 (R. 946) and devolving, by November 2003, to limited ambulation of 100 meters with unilateral assistance (or "one step short of being wheelchair-dependent.") *(Id.)*[15] While Unum may (and does) contest the rapidity of progression, its determination that Zurndorfer had not established that she suffered from a progressive type of MS, specifically primary progressive MS, was at best arbitrary: she had MS; it was not relapsing-remitting; it was necessarily progressive; and, almost unquestionably, it was primary progressive.

## B. Unum's Conclusion That Zurndorfer Was No Longer Disabled In May 2003 Was Arbitrary

In deciding to terminate plaintiff's long-term disability payments in May 2003, Unum did not rest its decision on a contemporaneous medical examination or other evidence that she was then able to perform her occupation. Instead it resorted to a syllogism: Zurndorfer was able to perform her job when she stopped work for shoulder surgery in August 2002, her MS was stable as found by Dr. Pascal in October 2002, and

---

[15] Unum contends that Dr. Picone's observation of further deterioration by November 2003 is irrelevant because it post dates their denial of disability in May 2003. Unum is correct to a point: her actual condition in November 2003 does not establish what her actual condition was in May 2003. To any neutral observer, however, this information would be highly relevant to establish that the nature of her MS was progressive.

31

therefore she was able to perform her job in May 2003 when her long-term disability payments were terminated.

Defendant's major premise—that plaintiff was capable of performing her regular occupation in August 2002 was based primarily on the fact that she worked full time until then. As Judge Posner has observed, defendant's argument is a "bad" one. *See Hawkings v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). For defendant's argument can only hold if there were a "logical incompatibility between working full time and being disabled from working full time, but there is not." *Id.* Worse, in deciding that plaintiff was not disabled from working because she had worked until August 2002, defendant refused to consider evidence from Zumdorfer, two of her colleagues, and her treating physician that Zumdorfer was increasingly unable to travel to visit her clients at their offices. Zumdorfer presented evidence that she regularly fell while making client visits and that her difficulty walking and using stairs limited her to half as many visits as she was expected to make. While defendant is entitled to come to reasonable conclusions about the reliability of the evidence that plaintiff presented of her inability to work before August 15, 2002, it cannot ignore the evidence in favor of nothing more than a bad argument. *See Di Pietro v. Prudential Ins. Co. of Am.*, No. 03 C 1018, 2004 U.S. Dist. Lexis 5004, at *16–*17 (N.D. Ill. 2004) (citing defendant's failure to consider letters from plaintiff's family, friends and co-workers reporting plaintiff's increasing difficulty working as indicative of arbitrary and capricious decision-making).

Unum repeatedly points to the October 2002 report of plaintiff's oncologist, Dr. Pascal, as evidence that she was not disabled by MS at that time. It is fair to say that Dr. Pascal concluded that plaintiff's progressive MS had stabilized while she was being

administered chemotherapy. But whether or not plaintiff's condition was stable in October 2002 sheds only limited light on whether her condition prevented her from performing her occupation at that time. And on that issue, it is clear that Unum itself concluded she was disabled by her MS when it granted her LTD benefits in November of 2002. While plaintiff stopped work to have arthroscopic surgery, she thereafter applied for LTD benefits on the basis of Dr. Picone's "primary diagnosis" of progressive MS which noted her shoulder bone spur as a "secondary condition." (R. 161.) Unum's own records indicate that a reasonable recovery time from arthroscopic surgery is 4–6 weeks. Yet 10 weeks later, on October 29, 2002, Unum approved LTD benefits noting that plaintiff "has MS reasonable to be disabled until next doctor's appointment 04/03." (R. 34.) Unum also confirmed that it had approved LTD benefits on the basis of plaintiff's primary diagnosis of MS when it concluded that her MS was a pre-existing condition and subject to payment at a 50% level. (R. 29.)

Of course, the issue that was before Unum, and is now before this Court, is not whether plaintiff was in fact disabled by MS in the Fall of 2002. Unum, despite its present protestations, found she was disabled and paid LTD benefits until May 23, 2003. The issue for Unum was whether plaintiff was disabled in May 2003; the issue for this Court is whether it was reasonable for Unum to rely so heavily on Dr. Pascal's opinion that her condition was stable while undergoing chemotherapy up until October 2002 in determining plaintiff's level of disability in May 2003. It was not. The fact that Zurndorfer's MS may have been stable during chemotherapy should not control a rational determination of plaintiff's condition some nine months after treatment has ended. Unum was obligated to examine her disabilities then, and not rely on a stale report to support a

33

flawed syllogism. The actual evidence of Zurndorfer's condition in May of 2003 shows a 57 year-old woman who can walk, with difficulty, no more than eight blocks, who uses a cane and wears a brace, and who has a documented history of falling. Precisely how she would be able to perform a job that requires significant travel, including 15 client calls a week carrying a briefcase, laptop and/or presentation materials is never rationally addressed.[16]

Moreover, Unum's claims decisions and supporting rationale are inconsistent with the assistance Unum's affiliate provided to plaintiff in applying for SSDI long-term disability benefits, which were granted by the SSA in April 2003. While a finding of long-term disability by the SSA is not binding on Unum, *see Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442–443 (2d Cir. 2006), Unum's active assistance in applying for such benefits in late 2002 surely indicates that defendant, unless it was seeking to defraud the SSA, believed plaintiff had MS and was disabled thereby. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294–295 (6th Cir. 2005) (noting that "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, 'casts additional doubt on the adequacy of their evaluation of . . . [a] claim, even if it does not provide an independent basis for rejecting that evaluation'") (quoting *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998)) (brackets and omissions in original) (emphasis in original omitted). Additionally, the fact that Unum "assisted [plaintiff] in obtaining disability benefits from the SSA, reaped financial benefits from this decision, and then . . . failed to explain why it reached a disability conclusion at odds with the SSA's findings" contributes to the conclusion that

---

[16] Unum's proposal that an individual using a cane and wearing a brace could "use a lightweight wheeled cart to assist in transporting these business materials" seems, at best, uninformed.

Unum's determination was arbitrary and capricious. *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 2008 U.S. App. LEXIS 1252, at *21 (6th Cir. 2008). Even if Unum had not actively aided Zurndorfer in obtaining SSDI benefits under an arguably more exacting standard of disability, its failure to address the SSA's contrary determination is at least some evidence that the Unum's decision was arbitrary and capricious. *See Rudzinski v. Metro. Life Ins. Co.*, No. 05 C 0474, 2007 U.S. Dist. LEXIS 69258, at *55 (N.D. Ill. Sept. 14, 2007) ("An ERISA plan administrator's failure to address the SSA's finding that a claimant is totally disabled is an indication that the plan's denial of LTD benefits is arbitrary and capricious."); *cf. Mikrut v. UNUM Life Ins. Co. of Am.*, No. 03 Civ. 1714, 2006 U.S. Dist. LEXIS 92265, *27–*28 (D. Conn. Dec. 20, 2006) (finding that administrators "treatment of [the SSA's determination], namely using it to demand a return of funds but failing to factor it in its analysis of [plaintiff's] claim, reveal[ed] that [its] decision was actually affected by its conflict of interest").

## C. Unum's Belated Efforts To Disregard The Travel Requirements Of Plaintiff's Job Was Arbitrary

In its final denial of LTD benefits, Unum seeks to justify its decision on the additional ground that any difficulties Zurndorfer has with stair climbing and building access are irrelevant as they are not a material duty of her regular occupation as it exists in the general economy. Unum's unstated argument is that plaintiff's specific disabilities solely relate to the idiosyncrasies of her job in Manhattan while her Plan only insures against an inability to perform her occupation as defined in the general economy. There are two critical flaws with this analysis, the first of which is that Unum previously concluded that her disabilities (limited walking, standing, gait disturbance, foot drop) in fact rendered her disabled in her occupation. (R. 19, 34.) Defendant should not be

35

permitted to change the standard by which it evaluates those disabilities. Second, it is a gross misreading of the record to imply that Zurndorfer's disabilities merely limited her use of stairs to access the subway and buildings. Unum's own vocational expert concluded that plaintiff's occupation required frequent travel (R. 25), by automobile, taxi, subway, plane or some combination thereof (R. 1343) and that some combination of presentation materials "up to 20 lbs." would have to be carried. Thus under any scenario, and certainly in any urban location, a fair amount of walking, carrying and climbing stairs would be material requirements of Zurndorfer's occupation. Unum's belated effort to categorize plaintiff's disabilities as related solely to a job located in New York City bespeaks advocacy, not a reasonable review of the administrative record. *See, e.g., Shore v. PaineWebber Long Term Disability Plan*, No. 04 Civ. 4152 (KMK), 2007 U.S. Dist. LEXIS 77039 (S.D.N.Y. Oct. 15, 2007) (finding that denial of benefits was arbitrary and capricious in part because plan administrator had not given appropriate "consideration [to] the nature of the institution where [the participant] was employed.") (quoting *Knistler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (second alteration in original).

## III.    Remedy

### A.    Reinstatement or Remand?

Having decided that defendant's termination of plaintiff's benefits was arbitrary and capricious, the Court must determine whether plaintiff is entitled to reinstatement of her benefits dating from May 23, 2003 or whether the Court should remand the case to the administrator for renewed evaluation of plaintiff's claims. *See Cook v. Liberty Life*

*Assurance Co. of Boston*, 320 F.3d 11, 24 (1st Cir. 2003). Remand is inappropriate

"where the difficulty is not that the administrative record was incomplete, but that a

denial of benefits based on the record was unreasonable." *Zuckerbrod v. Phoenix Mutual

Life Ins.*, 78 F.3d 46, 51, n.4 (2d Cir. 1996). Here, the Court finds that defendant's

termination of benefits based on the record that was before the administrator was

unreasonable, and not merely incomplete. While the Court has also determined that

defendant's decision was based in part on application an incorrect standard regarding the

travel requirements of her occupation, it finds that even had defendant correctly applied

the plan's terms there was not substantial evidence before the administrator to justify

termination of benefits. *Cf. Shore v. PaineWebber Long Term Disability Plan*, No. 04

Civ. 4152 (KMK), 2007 U.S. Dist. LEXIS 77039, at *44–*45 (S.D.N.Y. Oct. 15, 2007)

(remanding where administrator had failed to apply proper standard and where claimant

had supplied evidence to the district court that was not before the administrator). The

Court's conclusion that remand is inappropriate in this case is further supported by the

Seventh Circuit's opinion in *Hackett v. Xerox Corp. Long-Term Disability Income Plan*,

315 F.3d 771, 775–76 (7th Cir. 2003). In *Hackett*, the court held that where an

administrator arbitrarily terminates benefits "to which the administrator had previously

determined the claimant was entitled," the proper remedy is reinstatement, as it returns

the claimant to the status quo before the administrator's erroneous decision. *Id.* In this

case, the administrator extended LTD benefits to plaintiff while concluding that she was

unable to do her job (beyond the time necessary for recovery from her shoulder surgery)

based on physical limitations caused by her MS. Thus, here, as in *Hackett*, having been

"previously determined to be disabled, [Zurndorfer's] benefits would have continued

unaltered but for the plan administrator's arbitrary and capricious conduct." *Id.* at 776.

Thus, the Court finds that plaintiff's benefits should be reinstated as of May 23, 2003.

Defendant may, of course, continue to evaluate plaintiff's condition to determine if she

remains unable to perform the material duties of her regular occupation. *See Cook*, 320

F.3d at 25 (observing that reinstatement did not preclude a future termination of benefits

if plaintiff were later unable to prove disability under the meaning of the plan).

## B. Attorneys' Fees

ERISA "allows district courts, within their discretion, to award attorneys' fees

and costs to either party." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir.

1995). District courts should consider:

(1) the degree of the offending party's culpability or bad faith, (2) the
ability of the offending party to satisfy an award of attorney's fee, (3)
whether an award of fees would deter other persons from acting similarly
under like circumstances, (4) the relative merits of the parties' positions,
and (5) whether the action conferred a common benefit on a group of
pension plan participants.

*Id.* (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869,

871 (2d Cir. 1987). First, the Court notes that culpability does not require bad

faith; rather the Second Circuit has held that "a defendant is culpable under

*Chambless* where it violated ERISA, thereby depriving plaintiffs of rights under a

pension plan and violating a Congressional mandate." *Paese v. Hartford Life & Accident

Ins. Co.*, 449 F.3d 435, 450 (2d Cir. 2006) (internal quotations omitted). In *Paese*, the

Second Circuit affirmed an award of attorneys' fees where the district court held that the

record demonstrated culpability as defendant "had largely disregarded substantial

evidence of [claimant's] serious injuries and relied instead on snippets pulled out of

38

context from the medical records . . . and that by terminating [claimant's] benefits and forcing him to sue, [defendant] managed to avoid paying" a substantial sum over the course of more than two years. *Paese*, 449 F.3d at 450. In this case, defendant disregarded substantial evidence of plaintiff's disability depriving her of benefits for more than four years. Moreover, defendant turned a blind eye to a diagnosis of progressive MS that it had already accepted in originally granting LTD benefits, and instead focused on a snippet of the record that was clearly stale by the time defendant made the decision to terminate all benefits. Second, there is no question that defendant is capable of satisfying an award of fees. Third, as a larger provider of group disability insurance, defendant's determinations when contested in court are well known to and scrutinized by other plan providers who are likely to be deterred from acting in an unreasoned, arbitrary manner in similar cases. Fourth, as is evident from the foregoing opinion, the Court concludes that defendant's actions were arbitrary and its defense lacked merit. Finally, MS is a disease that afflicts a significant portion of the population and requiring disability insurers to approach coverage claims in a detached, scrupulous manner will provide some benefit to those who are severely afflicted. In sum, all of the relevant factors support an award of attorneys' fees.

## CONCLUSION

For the reasons stated above, defendant's motion for judgment on the administrative record [32] is denied. Plaintiff's motion for summary judgment [13] is granted. The parties are ordered to confer regarding the amount of money damages owed plaintiff consistent with this opinion and to submit a joint statement of damages by May 15, 2008. If the parties are unable to agree, plaintiff shall make her submission by May

15, 2008, and defendant shall respond by June 2, 2008. Plaintiff's counsel shall submit an affidavit and exhibits in support of an award of attorneys' fees.

SO ORDERED.

Dated: New York, New York
        March 31, 2008

Richard J. Holwell
United States District Judge